Filed 10/9/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re F.A., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, <br><br>    Plaintiff and Respondent, <br><br>      v. <br><br> H.S. et al., <br><br>    Movants and Appellants; <br><br> V.M. et al., <br><br>    Movants and Respondents. | G051494 <br><br> (Super. Ct. No. DP025349) <br><br> O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Richard Y. Lee, Judge.  Affirmed.

Rich Pfeiffer, under appointment by the Court of Appeal, for Movants and Appellants.

Nicholas S. Chrisos, County Counsel, and Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

Grace Clark, under appointment by the Court of Appeal, for Movants and Respondents.

Nicole Williams, under appointment by the Court of Appeal, for the Minor.

\*          \*          \*

Six days after F.A. (F.) was born exposed to methamphetamine, she was placed with Mr. and Mrs. S. (the S.s), foster parents who hoped to adopt her. Unfortunately, when F. was almost seven weeks old, the Orange County Social Services Agency (SSA) removed F. from the S.s' care, mistakenly believing exigent circumstances required the removal, and immediately placed the baby with Mr. and Mrs. M. (the M.s), who were also foster parents who hoped to adopt her. When SSA realized its mistake and decided to re-place F. with the S.s, the M.s filed a grievance, which kept F. in the M.s' home during the grievance process. The S.s and the M.s filed competing Welfare and Institutions Code section 388 petitions.[1] The court ordered SSA not to remove F. from the M.s' home pending the court's decision on the competing petitions, and granted visitation rights to the S.s. After many continuances, the court found both couples would be excellent adoptive parents, but granted the M.s' petition and denied the S.s' petition, finding the M.s had a "slight edge" because the M.s had an approved adoptive home study and because the baby had flourished under the M.s' care for the last 100 days.

On appeal, the S.s contend (1) this appeal should be treated as a writ petition, (2) SSA should have returned F. to the S.s before the M.s could file a grievance, (3) the court abused its discretion by granting so many continuances, (4) the court exceeded its authority by overriding SSA's decision to return F. to the S.s, rather than reviewing SSA's choice for an abuse of discretion, and (5) this case is not moot because

---

[1] All statutory references are to the Welfare and Institutions Code.

2

it presents an issue of continuing public importance which is capable of repetition, yet evading review, and therefore this court should offer guidance to prevent future heartbreak to foster parents from whom a child is wrongly removed.

We find no merit as to the S.s' first four contentions, but conclude that what happened to the S.s was wrong, and potentially could have been prevented had regulations and policies been in place allowing the foster parents to promptly challenge the grounds for removal before SSA placed the child with another couple. We nevertheless conclude the court did not abuse its discretion under the difficult circumstances presented, and accordingly affirm the court's orders. We decline to offer the requested guidance on how to avoid similar occurrences in the future. Having determined the court did not abuse its discretion in this case, any such guidance would amount to an advisory opinion and would potentially violate the separation of powers doctrine.

## FACTS

On August 21, 2014,[2] F. was born exposed to methamphetamine and placed in protective custody.[3] Six days later, SSA placed her with the S.s. Within three weeks, the S.s informed SSA they wished to adopt F.

On October 2, at Children's Hospital of Orange County (CHOC), a social worker removed F. from the S.s' care and terminated the placement because of concerns regarding the S.s' behavior at the hospital, including their alleged resistance to having F.

---

[2]     All dates refer to 2014 unless otherwise stated.

[3]     F.'s biological parents are not involved in this appeal and will not be mentioned in this opinion. On November 19, F. was declared a dependent child.

hospitalized.[4]  A child abuse investigation was commenced against the S.s based on allegations they refused to follow medical instruction.

The next day, on October 3, the S.s attempted to meet with SSA, but the SSA supervisor was unable to speak with them.  Three days later, on October 6, the S.s met with SSA and asked for an explanation of what they had done wrong.  SSA merely advised the S.s "they were not considered matched for adoptive placement and [had only been] asked to [provide] short term" placement for F.

The next day, on October 7, F. was discharged from the hospital in "fair" condition, having tested within normal limits on MRI, EEG, EKG, CBC, and CMP tests.

That same day, SSA placed F. with a new foster family, the M.s.  The M.s were selected as an adoptive match for F. and their home had been approved for adoptive placement.

Also on that same day, SSA interviewed the S.s as part of the child abuse investigation against them.  The S.s provided documentation and a chronology of events. In September, they took F. to a pediatrician and expressed their concerns that F. "was having tremors, mild seizures and difficulty feeding."  The pediatrician believed these were symptoms of methamphetamine withdrawal.  The S.s were concerned that F.'s symptoms might indicate a more serious condition, so they took F. to CHOC.  A CHOC neurologist recommended several tests for F., which could be done by individual specialists or could be expedited by having F. admitted to the hospital so all the tests could be done in one day.  The next day, the S.s took F. to the hospital for the expedited tests.  They were told an MRI was scheduled for the next day.  Because F. was crying inconsolably and unable to sleep at the hospital, the S.s asked if they could take the baby home and return the next day for the MRI and more tests.  The emergency room doctor replied if they went home, the baby would die.  Mr. S. explained to the doctor that the

_____
[4]  Other allegations involved Mrs. S.s' feeding F. donated breast milk and whether the S.s planned to have F. vaccinated.

4

reason for the hospital admission that day had been for F. to be watched and evaluated and undergo tests. The S.s contacted one of their referring CHOC doctors, who explained that if F. were checked out of the hospital, the referrals to specialists would be delayed. The S.s then understood the rationale for keeping F. at the hospital and agreed to do so. In short, the S.s denied wanting to leave the hospital against medical advice. The S.s stated they were "blindsided" when the social worker entered F.'s hospital room that day and told them the placement was being terminated and they had to leave the hospital. Before the S.s could talk to the social worker, hospital security escorted the S.s out of the building.[5]

Three days later, on October 10, SSA informed the S.s "the matter did not qualify for a grievance review due to the placement ending for exigent circumstances." In October, the S.s posted an on-line request for donations toward legal fees to obtain F.'s return to them. The S.s "lodged a complaint against" SSA.

On November 6, one month after F.'s placement with the M.s, an SSA deputy director determined F. should be returned to the S.s, finding: "[T]he infant should not have been removed from the [S.s'] home. This situation was not exigent. The allegations were not substantiated. And the [S.s] were operating responsibly under the circumstances with the input and conflicting advice of numerous medical professionals. [¶] The [S.s], although not already approved as an adoptive family, came to our agency willing to foster and expressing an interest to adopt. Had the [S.s] been given a 7-day notice as required by state regulations, the issues and concerns that arose at the hospital could have been resolved without the need of removing the infant from the [S.s'] home."

---

[5] A CHOC nurse stated in an interview with SSA that F. was admitted to the hospital "'only to rule out seizures,'" and the baby did not turn purple or have any seizures that day. The nurse reported that Mrs. S. was at the hospital with her other children, who were running around, and that F. was irritable at times, and Mrs. S. was trying to calm the baby down. The nurse could understand why Mrs. S. wanted to leave and return the next morning.

On November 7, a social worker met with the M.s to advise them of SSA's decision to re-place F. with the S.s. The M.s were given a "seven day notice for the child's removal." Six days later, on November 13, the M.s filed a grievance requesting that F. remain in their care. California State Department of Social Services (CDSS) policies mandated that F. remain with the M.s pending the decision on the M.s' grievance, unless the child was in immediate danger.

At a court hearing on November 24, the court continued the matter "to allow [the M.s'] grievance hearing to be completed." The court also scheduled a section 366.26 hearing for March 18, 2015.

On December 5, the grievance officer at the M.s' grievance hearing determined F. should not be removed from the M.s, because SSA "presented documentation and testimony that the [M.s] are a loving family who [have] done nothing but love and care for [F.] in an appropriate manner. [SSA's] proposed removal of [F.] from the [M.s'] home is not based on any concern regarding risk to the child or the care that the child is receiving in the home."

On December 11, SSA's chief deputy director overruled the grievance officer and denied the M.s' grievance request, making the "final decision" that F.'s best interests would be promoted by her return to the S.s and their two sons, with whom F. had formed bonds and from whose home she had been "imprudently removed."

At a hearing on December 11, the court stated that both parties had filed section 388 petitions — the S.s for placement of F. with them, and the M.s to be designated prospective adoptive parents, and (in a petition to be filed soon) that SSA abused its discretion by determining F. should be re-placed with the S.s.[6] The court

---

[6] The S.s' petition was dated October 22, and the M.s' first petition was dated December 11. The M.s' second petition is undated, but counsel had assured the court on December 11 that he could file it before close of business on December 12. The stamped filed date on all three section 388 petitions is December 19.

asked SSA to prepare a report by December 16.  The M.s' counsel asked to receive a copy of that report, but the court replied that since the parties did not have de facto parent standing, they were not entitled to see the report.  The court then denied without prejudice the respective requests of both the S.s and M.s for de facto parent status.  The court advised the M.s' counsel that, although the M.s had cared for F. for the last nine weeks, the court did not consider nine weeks to be a substantial amount of time.  The court added, "It's not to say that if the child remains placed with [the M.s] that at some point in the future [the court] wouldn't find them de facto."  The court wanted to avoid the possibility that F. could be moved four times in less than six months (which would happen if F. were returned to the S.s now, only to be returned to the M.s should the M.s prevail).  Therefore, the court ordered SSA *not* to re-place F. with the S.s until after the hearing that was scheduled for December 19 of the next week for the purpose of ruling on whether the respective section 388 petitions alleged a prima facie case warranting an evidentiary hearing.  The court granted the S.s unmonitored visitation of six hours to maintain their bond with F. until the hearing the next week.

SSA's December 17 report recommended F. be returned to the S.s and that the M.s' section 388 petition be denied.  The child abuse referral concerning CHOC had been investigated and closed, with SSA concluding, "It appears the [S.s] followed up with [the referring CHOC doctors'] recommendations to have the child evaluated to rule out seizures, apnea, and any other infection. . . .  It appears the [S.s] actively contacted and followed up with medical professionals in order to obtain a proper assessment of the symptoms they observed with" F.  CHOC doctors confirmed the S.s "did not indicate that they were leaving against medical advice."

On December 19, the court stated the parties and their counsel lacked standing to receive SSA's report.  The court found each party's section 388 petition showed a prima facie case warranting an evidentiary hearing.  The court found "a change in circumstance from the time that the court made the initial order to give general

7

placement authority to [SSA]. [B]oth sides present a . . . case that it would be in the best interest of the child" to be placed with their family. The court set the evidentiary hearing on the section 388 petitions for January 7, 2015. The court increased the S.s' visitation to 10 hours per week.

At the January 7, 2015 hearing, the court stated it agreed with SSA that the families could "appropriate[ly]" receive copies of SSA's report. The S.s wanted to proceed with the evidentiary hearing that day to achieve resolution, but the M.s' counsel wanted time to review SSA's report. F.'s attorney was opposed to any delay, stating F. needed resolution quickly and, that "[t]he longer we delay, the more difficult it becomes for the court and for me to make a recommendation to the court." The court continued the matter to January 21, delaying the process for two more weeks.

In a January 15, 2015 letter to the judge, the S.s stated the M.s were not their enemy and the S.s had made a decision not to "'fight' *against* them." The S.s wished to avoid being pitted againt the M.s, in a way that would require them "to point out their flaws, exploit their vulnerabilities and question their decency," since the M.s did "not deserve to be accused or have their good name and reputation questioned or slandered" as the S.s had experienced during the erroneous termination of F.'s placement with them. Nor was fighting the M.s in F.'s best interests. Because SSA agreed F. was improperly removed from their home, the S.s requested to release their retained attorney. The S.s did not desire to call any witnesses or to cross-examine any of the M.s' witnesses. The S.s opined SSA had the jurisdiction to re-place F. with them. The S.s believed that "allowing this situation to continue any longer is not in [F.'s] best interest and we ask for closure and a swift conclusion to this case."

At the January 21, 2015 hearing, the court continued the hearing for another week due to the unavailability of F.'s attorney. The court relieved counsel for the S.s at the S.s' request.

8

At the January 28, 2015 hearing, the S.s spoke first, after the court stated it had read the many letters of support submitted by the S.s, which showed how active they were in church activities and volunteer work. The S.s have two biological sons (then six- and three years old) and many pets. Mr. S. owned his own company and had a flexible schedule. Mrs. S. stayed home full-time, had coordinated Mothers of Preschoolers for many years, and led the children's ministry program at the family's church. Prior to staying home with her children, Mrs. S. was a full-time elementary school teacher and also had experience in special education. She has a master's degree in education with an emphasis on brain research in children. The S.s had fostered 14 children under the age of three. The S.s expressed some concern about whether F. was meeting developmental benchmarks or might be delayed due to her prenatal exposure to drugs. The S.s were "strongly in favor" of continuing a relationship with the M.s if F. were placed with them.

The M.s spoke next. When F. was placed in their home, Mrs. M. took a 13-week leave of absence from her marketing job to care for the child 24 hours a day. Upon Mrs. M.'s return to work, her parents provided care for F. during the day. Mr. M., a regional manager at a property management company, had raised a son who was 23 years old. The M.s stated they love F. as if she were their own biological child. Mrs. M. was unable to have children. The M.s stated that in F.'s recent development screening, she met all developmental goals. If F. were placed with the M.s, the M.s did not think continued contact with the S.s would be in the child's best interests; it would be better to stop the back and forth visits and have F. bond with just one family. Debbie H. spoke on behalf of the M.s, saying how they "wanted to adopt a baby of their own for a couple of years now and have gone through the heartaches that come with wanting a child."

Both families stated that, if they were chosen to adopt F., they were ready to meet the challenges that might arise from her prenatal exposure to drugs, although Mr. M stated they "really [did not] foresee too much of the bad right now."

9

The social worker testified that her personal professional opinion was that F. should remain with the M.s because F. was receiving adequate care in that home and had shown significant improvement in her health and development. The social worker was mindful that F., as a child born exposed to drugs, was likely to experience developmental delays. F. appeared to be bonded with the M.s. County Counsel had informed the social worker that SSA's executive director had deferred her "best interest" analysis to the social worker; however, SSA's executive director had not directly confirmed this with the social worker.

County counsel argued that SSA's official recommendation was to return F. to the S.s.

The court took the matter under submission. Pending the issuance of its final order, the court continued the S.s' weekly 10-hour visitation with F.

On February 10, 2015, the court rendered a written decision denying the S.s' section 388 petition and granting the M.s' section 388 petition. The court praised both families: "In balancing the competing homes of the [M.s and the S.s], the court again re-emphasize[d that F. was] truly fortunate to have two remarkable sets of foster parents willing to open their homes and lives to a little girl." Faced with a difficult choice, the court concluded "the following two facts provide a slight edge to the [M.s] in choosing a placement that is in the best interest of the minor: the [M.s] have an approved adoptive home study and have been 'matched' specifically with [F.] and the minor has flourished under the [M.s'] care over the last 100 days, is gaining weight and appears to be happy and healthy." "The court greatly sympathize[d] with the [S.s]." The court found SSA "correctly recognized its error in removing the minor from the [S.s] in the manner that it did, however, the remedy" was not to remove F. from the home she thrived in "for the last four months, approximately 80 [percent] of her life." The court allowed the S. family a good-bye visit with F. within 30 days.

DISCUSSION

*This Case Should Proceed as an Appeal, Not as a Writ*

This court has already summarily denied the S.s' substantively identical petition for writ of mandate in case No. G052017. In their opening brief on appeal, the S.s argue that, if they "are to obtain any relief, this appeal must proceed quickly." And, indeed, we have expedited this case, as we do all juvenile dependency cases. Practically speaking, this case could not have been handled any more quickly by this court.

F. recently celebrated her first birthday and has now been in the M.s' care for over 11 months. In their reply brief, the S.s express frustration that the M.s' counsel delayed in filing the M.s' respondent's brief on appeal, but that brief was filed only six days late. The S.s state they "understand what the passage of time did, what they want is a solution. Even if [F.] is not returned to them, they do not want this to happen to any other foster family or foster child."

*SSA Followed CDSS Rules by Keeping F. in the M.s' Home Pending a Final Decision on the M.s' Grievance*

The S.s contend SSA should have returned F. to them before the M.s could file a grievance.[7] But SSA was prohibited from doing so by the regulations set forth in the California Child Welfare Services Manual of Policies and Procedures (CDSS Regulations).[8] Under CDSS Regulation 31-440.1, the M.s were entitled to "at least seven

---

[7] The M.s contend this court lacks jurisdiction to consider this contention because the S.s' notice of appeal was from the court's order denying the S.s' section 388 petition. But the S.s filed their section 388 petition based on the changed circumstances that SSA removed F. from their home and had failed to re-place the child with them. We liberally construe a notice of appeal to implement the strong public policy favoring the hearing of appeals on their merits. (*Norco Delivery Service, Inc. v. Owens-Corning Fiberglass, Inc.* (1998) 64 Cal.App.4th 955, 960-961.)

[8] Available at <http://www.cdss.ca.gov> (as of Oct. 8, 2015).

11

calendar days' advance written notice of intent to remove a child, and of the right to request a grievance review." CDSS Regulation 31-020.7 mandated that, because F. was not in "immediate danger," SSA could not remove her from the M.s' home "pending decision of the county director" on the M.s' grievance complaint.

*The Court Did Not Abuse Its Discretion by Continuing the Hearing Four Times After December 11*

The S.s contend the court abused its discretion by granting four continuances after December 11 — i.e., after the date when the M.s' grievance process had been completed and SSA had made a final decision to re-place F. with the S.s.

"Continuances are discouraged in dependency cases." (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 604.) Nonetheless, upon request of counsel for the minor or petitioner, the court may continue a hearing unless a continuance would be "contrary to the interest of the minor. In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (§ 352, subd. (a).) We review the court's rulings on continuance requests for an abuse of discretion. (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1481.)

The two months between the December 11 continuance and the court's final February 10, 2015 orders constituted over a third of F.'s young life at that time. It is unfortunate that the court first appropriately ruled that the M.s and the S.s, as nonparties, could not receive copies of SSA's report, but then decided three weeks later, at SSA's urging, that the couples could receive the report, resulting in another two week continuance, over the S.s' objection, to allow the M.s' counsel to read the report.

12

Nonetheless, the court did not abuse its broad discretion. The court expressed several times its intent and concerted effort to expedite the process, stating as early as December 19 it was trying very hard to minimize delay and apologizing for any delays for which it was responsible, but also recognizing its duty to decide whether F's best interest would be served by placing her with the M.s or with the S.s. The court's reason for each respective continuance was neither arbitrary nor capricious.

*Court Authority and SSA Discretion*

The S.s contend the court was authorized to review SSA's placement decision to return F. to the S.s' home only for an abuse of discretion. They argue SSA's decision was not an abuse of discretion. They conclude the court erred by ruling F. could not be moved from the M.s' home, even after the M.s' grievance was completed, pending the court's decision on the competing section 388 petitions.

On December 11, the M.s' grievance process had been completed and SSA had determined it was in F.s' best interests to be re-placed with the S.s. According to the court's comments on that date, both the S.s and the M.s had filed section 388 petitions. The court forbade SSA from re-placing F. with the S.s and removing her from the M.s' home pending the court's decision on the competing section 388 petitions. The court had the authority to do so because, although a section 366.26 hearing had been scheduled, the hearing had not yet been held and the parents' parental rights had not been terminated.[9]

At the evidentiary hearing on the section 388 petitions, F.'s attorney advised the court she believed the court was authorized only to decide whether SSA's decision to return F. to the S.s was an abuse of the agency's discretion. She acknowledged, however, she had not "found a case specifically on point for pre-

---

[9]  Pursuant to SSA's request, we take judicial notice of the March 18, 2015 minute order which terminated the biological parents' parental rights and placed F. for adoption.

13

termination of parental rights placements." On appeal, the S.s argue that this court's decision in *In re Lauren R.* (2007) 148 Cal.App.4th 841 (*Lauren R.*) is that "on point" case.

After a court has terminated parental rights and referred the child to an agency for adoptive placement, the agency "has the sole authority to determine such placement, subject only to judicial review for abuse of discretion." (*Department of Social Services v. Superior Court* (1977) 58 Cal.App.4th 721, 724 (*Social Services*).) This is because, in subdivision (j) of section 366.26, "the Legislature has granted the agency to which a minor is referred for adoption . . . the 'exclusive' custody, control and supervision of the minor referred for adoptive placement." (*Social Services*, at p. 724.) After all, the agency "has been given the resources for investigation and evaluation of the placement decision." (*In re Harry N.* (2001) 93 Cal.App.4th 1378, 1398.)

In *Lauren R.*, *supra*, 148 Cal.App.4th 841, we held that a different subdivision of section 366.26 — i.e., subdivision (k) which establishes a preference for "'a relative caretaker or foster parent'" (*Lauren R.*, at p. 855) under certain circumstances — is triggered by "the intent to place the child for adoption, not necessarily the termination of parental rights or the termination of reunification services" (*id*. at p. 856). Our holding was based on the language of subdivision (k), which applies to "a dependent child for whom the court has approved a permanent plan for adoption, *or* who has been freed for adoption . . . ." (*Id.* at p. 855, italics added.) In *Lauren R.*, the trial court had approved a permanent plan of adoption for Lauren under section 366.26, subdivision (c)(3). (*Lauren R.*, at p. 856.)

In contrast to subdivision (k), the text of subdivision (j) does not contain two disjunctive prongs, but instead applies when the court "declares the child free from the custody and control" of one or both parents and refers the child for adoption — in other words, after termination of parental rights. Thus, because the court had not yet

14

terminated parental rights during the proceedings at issue here, the court's authority was not limited to simply reviewing SSA's decisions for an abuse of discretion.

*We Urge CDSS and SSA to Consider Whether New Procedures Should be Adopted for the Protection of Foster Parents when Children are Removed From Their Care Under Perceived Exigent Circumstances*

The S.s request that we find that "what happened in this case should not have happened and give trial courts and attorneys guidance on how to proceed with similar issues that are likely to repeat themselves, so other families and children are not put through a similar litigation." They "understand the chances of regaining custody of [F.] is remote solely due to the passage of time." "The S.s respectfully request a remedy be set by this Court so this issue, that has a great potential to repeat itself, does not harm other families or children."

Recognizing that we review the court's orders under the abuse of discretion standard of review, thereby making it unlikely they will achieve a personal remedy, such as the return of F. to them, the S.s request that we address what went wrong here, in the hope of potentially forestalling future heartache for foster parents caught in similar situations. The S.s argue this appeal should not be treated as moot, relying on *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1404, which states "a reviewing court may exercise its inherent discretion to resolve an issue rendered moot by subsequent events if the question to be decided is of continuing public importance and is a question capable of repetition, yet evading review."

We agree with the S.s that this case presents "heart wrenching facts." The system failed the S.s. Why? Is the system defective, or was it wrongly implemented by the court and/or SSA?

The S.s suggest "the correct remedy" is that F. "should have been immediately returned to the S.s the moment SSA discovered she should not have been removed." Yet, as discussed above, the CDSS Regulations prevented SSA from doing

15

so, because the CDSS Regulations guaranteed the M.s the procedural safeguards of a seven-day notice of removal of the child, a fair hearing, and the continued placement of F. in their home pending the completion of the grievance process.

The S.s, on the other hand, were denied any accommodations in the immediate aftermath of SSA's removal of F. from their care. The following is a chronology of what happened. On October 2, a social worker came into F.'s hospital room and summarily told the S.s that SSA was forthwith removing the baby from their care, whereupon CHOC security escorted the S. family from the building. On the day after the emergency removal, the S.s sought an explanation of what they had done wrong.[10] The SSA supervisor, however, was "unable" to speak with the S.s, nor, apparently, was anyone else at SSA available or authorized to speak with them. Three days later, SSA told the S.s the agency had never approved them as candidates for adopting the child. The next day, F. was released from the hospital, and SSA *immediately* placed the baby with the M.s., who signed a concurrent planning agreement "indicating their unequivocal desire to adopt" her. Three days later, SSA informed the S.s they were not entitled to lodge a grievance due to the exigent nature of the removal of F. from their care. But, at some point, SSA did begin investigating a child abuse referral *against* the S.s based on the October 2 events at CHOC. The S.s retained an attorney and lodged a complaint against SSA. Finally, one month after F. was placed with the M.s, SSA determined (1) the agency had wrongly removed F. from the S.s' home, (2) the situation at CHOC had not been exigent, and (3) if SSA had given the S.s the seven-day notice required in non-exigent circumstances, F. would not have been removed from the S.s' care.

---

[10] SSA later determined the S.s had done nothing wrong. The snafu at CHOC occurred solely because the S.s had proactively sought medical tests for F. because of their concern about her symptoms and because they had brought her to the hospital one day after a doctor said they could *electively* take her to the hospital for in-patient tests if they wanted to speed up the process.

16

The system, i.e., the CDSS Regulations, do not appear to provide any procedural protections for foster parents from whom a child "in immediate danger" is removed.[11] The CDSS Regulations specify that the "county" is not required to provide seven-day notice of intent to remove a child if the "child is in immediate danger." (CDSS Regulations, 31-440.2, 31-440.21.) And, when a child is in immediate danger at the time of removal, a grievance review may "not be granted." (CDSS Regulations, 31-020.2, 31-020.21.)

Apparently, SSA's policies, at least as they were implemented here, do not afford any such protections either. Within the first few days after F.'s removal from the S.s' care, SSA gave the S.s no chance to articulate a prima facie case that F. was not in immediate danger at the time of her removal, despite the S.s' efforts to do so. Instead, SSA placed F. with the M.s without a moment's delay. It appears SSA's eventual investigation of the CHOC snafu resulted only from the child abuse referral against the S.s and/or the S.s' retaining an attorney and lodging a complaint against SSA.

When allegations of immediate danger to the child are unfounded, the wronged foster parent suffers, not just the loss of a foster child, but also harm to the foster parent's reputation, particularly when a child abuse referral has been lodged against him or her. The problem is compounded when the agency immediately places the child in a concurrent planning home with another family, creating the potential for instant conflict between two families and inevitable heartbreak for at least one family. The child, meanwhile, is caught in limbo between two families for an extended period of time.

---

[11] We have reviewed only CDSS Regulations 31-020 and 31-440.

17

The parties have not raised or briefed the issue of the absence of procedural protections for foster parents from whom a child allegedly "in immediate danger" is removed.[12] But, the S.s have asked us to afford guidance as to a possible "remedy" which might be advisable in the future. We truly sympathize with the S.s. But we have determined the court did not abuse its discretion in making the difficult decision with which it was tasked. It is not appropriate that we issue an advisory opinion suggesting a remedy for an unknown future case. And under the doctrine of separation of powers, we may not encroach upon SSA's own "internal management" (*In re Ashley M.* (2003) 114 Cal.App.4th 1, 9) or "matters of administrative detail" (*Smith v. Board of Education* (1946) 76 Cal.App.2d 662, 668). We do suggest, however, that CDSS and SSA consider whether new regulations, procedures, or policies should be implemented to provide some measure of protection for foster parents who suffer the removal of a child from their care under perceived exigent circumstances that turn out to be unfounded.

---

[12] We do not suggest that a foster parent (as opposed to a prospective adoptive parent or a de facto parent) has a constitutionally protected interest in the foster child. It is the proponent's "burden to establish such a fundamental right." (*Social Services*, *supra*, 58 Cal.App.4th at p. 737.) *C. V. C. v. Superior Court* (1973) 29 Cal.App.3d 909 "held that prospective adoptive parents have a fundamental interest in a child placed with them, which entitles them to due process protection before the child is removed from their home." (*Social Services*, at p. 736.) "An imminent danger to the child's health or safety would create an exceptional situation, elevating the public interest in summary termination above the interests of the prospective parents, justifying removal first and hearing later." (*C. V. C. v. Superior Court*, at p. 917.) A foster parent may become a prospective adoptive parent by virtue of the intent of the agency and the foster parent, "along with the objective indicia of adoption proceedings." (*Jinny N. v. Superior Court* (1987) 195 Cal.App.3d 967, 972.) De facto parents, too, have procedural due process rights. (*In re Matthew P.* (1999) 71 Cal.App.4th 841, 850-851.)

DISPOSITION

The court's orders are affirmed.


IKOLA, J.

WE CONCUR:


ARONSON, ACTING P. J.


THOMPSON, J.