Filed 2/23/22  In re E.F. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re E.F., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. H.F., Defendant and Appellant. | G060699 (Super. Ct. No. 20DP0188) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Antony C. Ufland, Judge.  Affirmed.

Marsha F. Levine, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

*　　*　　*

H.F. (Mother) appeals from an order terminating her parental rights over her now 11-year-old daughter, E.F. (Minor), at a hearing pursuant to Welfare and Institutions Code section 366.26 (.26 hearing).[1] She contends the Orange County juvenile court (the court) should not have terminated her parental rights because Minor's relationship with her two half siblings qualified for the sibling relationship exception under section 366.26, subdivision (c)(1)(B)(v). We disagree. Mother failed to establish the sibling relationship exception to termination of parental rights. We accordingly affirm the order.

FACTS

*Detention*

In February 2020, Minor (age nine) and her half siblings, Em.M. and E.M. (ages five and three), were taken into protective custody. According to the Orange County Social Services Agency's (SSA) detention report, a police officer found Mother and the children in a parking lot with Mother under the influence of methamphetamine. The children appeared to be dirty and in a general state of neglect. Mother had been homeless for approximately one year. Minor's father was deceased while the half siblings' father had moved out of state.

The detention report noted Mother had a history of substance abuse, which included two prior arrests for possession of an unlawful substance. She previously also attempted suicide, and the maternal grandmother stated Mother was diagnosed with bipolar disorder but refused to take medication. The maternal grandmother further stated she could not handle Mother staying with her "because of the mess . . . she makes" and her "yelling and cursing at the children." With respect to Minor, the report noted she was

---

[1] All further statutory references are to the Welfare and Institutions Code.

relegated to caring for her half siblings, did not have friends, and was isolated in Mother's care.

Soon after, SSA filed a petition pursuant to section 300, subdivisions (b)(1) and (g). The petition detailed Mother's substance abuse, mental health issues, failure to maintain a safe and sanitary home, and failure to consistently and adequately meet the educational and developmental needs of the children. Two days later, the court detained Minor from Mother's custody pending jurisdictional proceedings.

*Jurisdiction/Disposition*

Prior to the jurisdiction/disposition hearing, SSA recommended the court sustain the petition, declare the children to be dependents, and provide reunification services to Mother. SSA's report indicated Minor had been placed in the care of her paternal grandmother while the half siblings remained in another foster home. Minor expressed being happy and safe in her grandmother's care and also said she wished she could live with Mother and the half siblings. The report further noted sibling visitation had been coordinated and accomplished during the reporting period.

In May 2020, Minor reported she kept "forgetting" to call her half siblings but knew she could call them whenever she wanted. She generally did not have any concerns and enjoyed living with her paternal grandmother. As of late June 2020, Minor noted she had three in-person visits with Mother at a local park and stated the visits had gone well. She also stated she maintained contact with her half siblings via FaceTime and knew she could call them whenever she wanted. As of late July 2020, Minor reported she had a video call with her half siblings the previous week.

3

On July 29, 2020, the court sustained an amended petition, declared Minor a dependent, removed her from Mother's custody, and ordered reunification services to Mother.

*Reunification*

In August 2020, the caregiver for Minor's half siblings reported the half siblings did not "talk much about" Minor. She stated the children occasionally had phone calls via FaceTime and believed this occurred after Mother spoke with Minor about calling her half siblings. In September 2020, the same caregiver mentioned the paternal grandmother had not reached out to have a visit between the children. She suggested the only time the children have a visit is when Mother tells Minor she needs to visit with her half siblings.

In late September 2020, the paternal grandmother reported Minor called her half siblings about one to two times per month and talked for around ten minutes. The paternal grandmother was open to having visits with the children but stated it was difficult having visits through video calls. She stated she would see if Minor wanted to have an in-person visit with her half siblings.

In November 2020, the paternal grandmother told the social worker she had arranged a video call to take place that day. Minor appeared happy to be having a visit with her half siblings. In December 2020, Minor requested to have a video call for her half sibling's birthday. The call lasted about ten minutes. This was one of two calls Minor had with her half siblings in December. Minor had requested to have both calls scheduled.

As to Mother's reunification efforts, Mother's service plan included counseling, a domestic violence program, parent education, and substance abuse treatment. According to SSA's report, Mother had not provided contact information for

4

any programs although she claimed to have participated in some of them. Mother's mental health and substance abuse problems also remained unresolved.

Meanwhile, the paternal grandmother stated she would like to adopt Minor if Mother was unable to reunify with her. The caregiver of the half siblings stated she did not want to adopt them but would keep them in her care until a suitable placement was found.

The court later continued the six-month review hearing to April 2021 for a combined six-month and 12-month hearing. As of February 2021, Mother had not visited with Minor since late October 2020. SSA's addendum report indicated the social worker had difficulty contacting Mother because she kept changing her phone number. In late March 2021, the paternal grandmother noted Minor called the half siblings about twice a month but Minor generally did not talk about Mother, who she had not seen since October 2020.

SSA's report for the 12-month review hearing recommended terminating Mother's reunification services and scheduling a .26 hearing. The report also indicated Minor's paternal grandmother was not open to placement with the half siblings who remained with their caregiver. The caregiver was willing to keep the half siblings in her care until suitable placement was found for them. The report further noted the half siblings visited with Minor "about once a month or so."

On April 13, 2021, the court terminated Mother's reunification services as to Minor and set a .26 hearing for August 2021.

*Post-Reunification Period*

In July 2021, SSA filed a section 366.26 report. According to the report, Minor spoke to the social worker in April 2021 and stated she would like to continue living with the paternal grandmother if she could not live with Mother. After the social

5

worker explained the paternal grandmother wanted to adopt Minor, Minor "appeared to understand and appeared okay with it."

The report also noted the respective caregivers had arranged for monthly visits with the siblings as of May 2021. The half siblings' caregiver noticed the siblings asked Minor for a lot of help and "regressed to baby behaviors." During the visits, Minor occasionally gave gifts to the half siblings.

Meanwhile, Mother and Minor finally had an in-person visit in July 2021. The report indicated Mother's history of substance abuse and mental health issues remained unresolved. Mother also had told the social worker she was homeless and waiting to get into a rehab program.

*.26 Hearing*

The assigned social worker, Robert Gomez, Mother, and Minor testified at the .26 hearing, which took place in August 2021. Gomez testified he had been Minor's assigned social worker for a little over a year. Among other things, he testified Minor had regular visits with her half siblings and told him she took care of them during their visits. The monthly visits lasted between 45 and 90 minutes, and Minor told Gomez she enjoyed the visits.

According to Mother's testimony, Minor was a "good big sister" to her half siblings. She described Minor as being "good at playing with them," keeping "them from arguing with each other," and redirecting their bad behavior. Mother had last seen Minor with the half siblings in March or April 2020. On one occasion, Mother had spoken to Minor about her visits with the half siblings, and Minor stated she liked the visits and wished she could see them more.

Finally, Minor testified she "[v]ery much" liked visits with her half siblings, and her grandmother allowed her to call them whenever she wanted. She visited

6

the half siblings every month and last visited with them in the prior week. She also talked to them on video calls.

With respect to the in-person visits, Minor testified she wished they happened more than once a month because "it [made her] happy to get to visit them." During their visits, Minor stated they usually met at a park where they played, and she sometimes gave gifts to the half siblings. When asked if she felt like she had to take care of the half siblings during their visits, she testified she did not. Minor further testified she wished to live with her half siblings. When asked how long she had previously lived with the half siblings, Minor testified, "For most of my life — well, their entire lives."

As to Mother, Minor testified she felt sad when she did not see her for a period of time. Minor's "number one choice" was to live with Mother. But Minor felt safe with the paternal grandmother and was "okay" with the grandmother deciding if Minor had visits with Mother because she trusted the grandmother to make the right decisions.

The court then heard closing arguments. SSA argued for the termination of parental rights. As to the sibling relationship exception, SSA argued the benefit of adoption outweighed severing the relationship. Regardless, SSA argued the respective caretakers would continue those relationships. Even if they did not, SSA noted Minor testified she trusted her grandmother to make the right decisions.

Minor's counsel agreed with SSA and argued the sibling relationships were insufficient to bypass adoption. According to Minor's counsel, Minor "was extremely parentified in taking care of her siblings for the majority of her life" and only recently engaged with them as a "sibling." Minor's counsel concluded there was not "a significant sibling relationship between them in that termination of that would be detrimental in comparison to the benefit of the permanency and stability of adoption." In

7

any event, Minor's counsel noted there was no reason to believe Minor's contact with her half siblings would not continue.

Mother's counsel argued the court should apply the beneficial parental relationship exception or sibling relationship exception to termination of parental rights. As to the latter, Mother's counsel argued termination of parental rights was not in Minor's best interest because of the bond Minor had with her half siblings. Mother's counsel noted Minor requested to call her half siblings and visit with them. She also argued the sibling relationship was significant, which was evident by Minor's desire to give gifts to her half siblings and her desire to visit and live with them. According to Mother's counsel, there was "no guarantee . . . the siblings will be able to have a relationship with [Minor] . . . if there's a termination of parental rights." She further emphasized the half siblings were still in a family reunification plan and terminating parental rights would be "jumping the gun" because it was not clear what would happen with the half siblings. Mother's counsel requested the court continue the .26 hearing "to see what would happen with the siblings, because . . . it [was] too early for the court to make the decision to terminate parental rights without knowing what's going to happen with the siblings."

After argument from counsel, the court found Minor adoptable and terminated Mother's parental rights. As to the sibling relationship exception, the court found Minor's bond with her half siblings bond did not justify bypassing adoption. The court noted "there was a time period" when they lived together but they had not been together "in almost two years." The court also found there was no evidence of shared significant common experiences. While the court hoped the sibling visits would continue and acknowledged the visits were "nice and [Minor] enjoy[ed] them," the court held Minor's relationship with the half siblings was not "so strong, so powerful, so critical" to justify bypassing adoption.

Mother filed a timely notice of appeal from the court's termination order.

DISCUSSION

Mother contends the court erred by finding the sibling relationship exception did not apply. According to Mother, Minor's relationship with her half siblings was significant enough to overcome the legislative preference for adoption as a permanent plan for Minor. She also argues the court erred by denying her request to continue the .26 hearing pending resolution of the half siblings' permanent placement. We disagree.

*The Sibling Relationship Exception*

A. Applicable Law and Standard of Review

At a .26 hearing, the court determines whether there is clear and convincing evidence a minor is likely to be adopted. (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 291 (*Daisy D.*).) If so, the court must terminate parental rights and order the minor placed for adoption unless a statutorily enumerated exception applies. (§ 366.26, subd. (c)(1).)

The sibling relationship exception under section 366.26, subdivision (c)(1)(B)(v) is one exception to termination of parental rights. To establish the sibling relationship exception, a party opposing termination of parental rights and adoption must prove "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term

9

emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

"The purpose of [the sibling relationship] exception is to preserve long-standing sibling relationships that serve as 'anchors for dependent children whose lives are in turmoil.'" (*In re Isaiah S.* (2016) 5 Cal.App.5th 428, 437.) But "[t]he author of the legislation . . . anticipated that 'use of the new exception "will likely be rare,"' meaning 'that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption.'" (*Daisy D., supra*, 144 Cal.App.4th at p. 293.)

In determining whether the sibling relationship exception applies, the court first considers "'whether terminating parental rights would substantially interfere with the sibling relationship . . . .'" (*In re D.O.* (2016) 247 Cal.App.4th 166, 173 (*D.O.*).) "'*If* the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption.'" (*Id.* at pp. 173-174.)

We apply the substantial evidence standard to the court's underlying factual determinations and review the court's weighing of the maintenance of the sibling relationship versus the benefit of adoption for an abuse of discretion. (*D.O., supra*, 247 Cal.App.4th at pp. 173-174.) Applying these standards, we find no error.

B. Mother Failed to Prove the Sibling Relationship Exception Applied

As discussed *ante*, the court first considers whether terminating parental rights would substantially interfere with a sibling relationship. If the court finds substantial interference, the court then weighs the benefit of the sibling relationship against the benefit of adoption. Here, the court found terminating Mother's parental rights would not substantially interfere with the children's sibling relationship. Although

the children had lived together in the past, the court noted they had not lived together in almost two years. Likewise, the court found no shared significant common experiences or particularly strong bonds. These findings were supported by substantial evidence.

At the outset, we note Minor's grandmother facilitated monthly visits and video calls between the children while Minor was in her care. Minor also previously reported she could call her half siblings whenever she wanted. There accordingly was no evidence termination of parental rights and freeing Minor for adoption to her paternal grandmother would substantially interfere with Minor's sibling relationship.

Mother contends there is no guarantee the sibling relationship will continue and speculates this will depend on the half siblings' permanent placement. According to Mother, "because the siblings' permanent plan is not known, there was no way for the court to know whether visitation between [Minor] and her siblings would be continued." As SSA correctly argues, it was Mother's burden to establish the sibling relationship would be disrupted, not SSA's burden to prove they would be preserved. In *D.O.*, *supra*, 247 Cal.App.4th 166, the mother and siblings argued "'no evidence supported the juvenile court's finding that the sibling relationship would remain intact, except for speculation that the caregivers would continue to allow it.'" (*Id.* at p. 176.) The court of appeal rejected this argument, explaining the mother and siblings had the burden of proving there would be substantial interference with the sibling relationship and "not the Agency's burden to establish there would not." (*Ibid.*) We reject Mother's argument for the same reason.

To show substantial interference with a sibling relationship, the court also considers the nature and extent of the relationship. Mother relies on evidence of the close bond Minor shared with her half siblings. Mother points to Minor's testimony that she wanted to live with the half siblings, enjoyed monthly visits with them, and took gifts for them. Mother also notes Minor generally requested the visits with her half siblings and

11

previously lived with them. While the children shared a loving bond, the court could reasonably determine the children's monthly visits and occasional video calls were ultimately secondary aspects of Minor's life. The children also had not lived together for almost two years. The record accordingly does not suggest their relationship was so strong to serve as an "'anchor[] for dependent children whose lives are in turmoil.'" (*In re Isaiah S.*, *supra*, 5 Cal.App.5th at p. 437.) In other words, the benefits from their bond are not more beneficial than the benefits Minor would receive from adoption. (*Daisy D.. supra*, 144 Cal.App.4th at p. 293 [exception inapplicable where "the minor had visits with her half-siblings between two and four times a month" and "clearly enjoyed the time she spent with her half-siblings"].) The court reasonably concluded Minor was best served by the permanency of adoption and properly terminated parental rights.

*Mother's Requested Continuance*

Mother next argues the court erred by denying her request to continue the .26 hearing pending resolution of the half siblings' permanent placement. We disagree.

We review a court's order denying a continuance for abuse of discretion, keeping in mind that "'[c]ontinuances are discouraged in dependency cases.'" (*In re F.A.* (2015) 241 Cal.App.4th 107, 117.) "Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing . . . ." (§ 352, subd. (a)(2); *Jeff M. v. Superior Court* (1997) 56 Cal.App.4th 1238, 1242.) Convenience of the parties is not good cause. (§ 352, subd. (a)(2).) The court also shall not grant a continuance "that is contrary to the interest of the minor." (*Id.*, subd. (a)(1).) "In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (*Ibid.*)

12

Here, the court did not abuse its discretion by denying Mother's request for an indefinite continuance to determine the half siblings' permanent placement. Speculation as to the half siblings' fate and whether their placement would interfere with the children's visits did not justify overriding Minor's need for prompt resolution. The court accordingly did not err by finding it was not in Minor's interest to delay permanence in her existing placement.

DISPOSITION

The order is affirmed.


MARKS, J.*

WE CONCUR:


MOORE, ACTING P. J.


FYBEL, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.