Filed 3/8/16  In re D.R. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SEVEN

| | |
|---|---|
| In re D.R., a Person Coming Under the Juvenile Court Law. | B264741 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. AMBER V., Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK06651) |

APPEAL from an order of the Superior Court of Los Angeles County, Julie Fox Blackshaw, Judge.  Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Julia Roberson, Senior Associate County Counsel, for Plaintiff and Respondent.

————————————————————

# INTRODUCTION

Amber V. appeals from the jurisdiction findings and the disposition order declaring her son, D.R., a dependent of the juvenile court and removing him from her custody. The court sustained an amended petition under section 300, subdivision (b), of the Welfare and Institutions Code[1] alleging that Amber waited two days to take D.R. (then seven months old) to the doctor after he broke his leg, and that, after Amber took D.R. to receive medical treatment, she removed the cast on his leg against medical advice and then repeatedly refused to have the leg re-cast. Amber argues that the disposition order removing D.R. from her custody is not supported by substantial evidence.

The record does contain evidence that Amber has worked diligently to become a better parent, for which she should be commended, and that she regrets her actions may have harmed or did harm D.R. Nevertheless, because we resolve all conflicts in favor of, and make all reasonable inferences from the evidence to uphold, the court's order, we affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Family*

Amber was born in 1993. When she was six months old, Amber was detained by the Los Angeles County Department of Children and Family Services. Amber's mother abused and neglected her, and Amber was "in and out of the system" until she was 17 years old. Although Amber "grew up in the system," she "wanted to break the cycle with her own children."

---

[1]    Undesignated statutory references are to this code.

D.R. is Amber's only child.[2]  In August 2013, while she was pregnant with D.R., Amber moved in to St. Anne's Transitional Housing Program for "at-risk pregnant young women, mothers and children."  At St. Anne's, Amber attended weekly parenting classes, weekly Workforce Development Workshops, and semiweekly meetings with St. Anne's Family Advocate "to work on her educational, employment and self-sufficiency goals."  By all accounts, Amber participated in the wide range of services offered at St. Anne's, including mental health services and counseling.

Beginning in November 2013, Amber also worked with a social worker through Casey Family Programs' Young Adult Transition Services program, which helps former foster youth "expand[ ] and strengthen[ ] their support network beyond foster care and, when possible, safely achiev[e] and maintain[ ] relational/legal permanence."  With help from Casey Family Programs, Amber earned her general education diploma.  In December 2013, when D.R. was born, Amber's Casey Family Programs social worker referred her to Black Infant Health, where Amber sought out and received "Health Education and Counseling, Parenting Information, Nutrition Information, [and] Social Support as a new parent."  Amber and D.R. lived with Amber's great grandmother for two months after the birth, and then Amber and D.R. moved back to St. Anne's.

## B.    *The First Referral*

The Department first learned of D.R. in March 2014 when it received a referral after Amber allowed her mother, who had unresolved substance abuse and mental health issues and who had abused Amber when she was a child, to babysit D.R.  When Amber picked up D.R., Amber's mother assaulted Amber while Amber was holding D.R. Neither Amber nor D.R. was injured.  At the time, Amber was living at St. Anne's, and she and the St. Anne's staff agreed that she should not allow D.R. near her mother again.

---

[2]     D.R.'s father is not a party to this appeal.

C.     *The Second Referral*

In June 2014 the Department received a second referral after Amber again allowed her mother to babysit D.R.  When Amber picked up D.R., her mother followed them, grabbing D.R.'s arm and poking him.

While investigating the June 2014 referral, a Children's Social Worker saw Amber leave D.R. (then six months old) unattended on a couch with the back couch pillows on the floor.  The social worker explained to Amber that, even though Amber had put pillows on the floor, leaving the child on the couch was not safe because D.R. could fall and hurt himself.  Amber agreed with the social worker and said she understood the importance of not leaving D.R. unattended on a raised surface.  Amber also agreed that it would not be safe to leave D.R. with her mother again and that she would use St. Anne's daycare.

D.     *The Third Referral, Detention, and Jurisdiction Findings*

On July 25, 2014 the Department received a third referral because D.R. had broken his leg (fracturing his tibia and fibula) after falling off a bed.  The accident happened on July 23, 2014, but Amber waited two days to take D.R. to the doctor.  Although D.R.'s leg was swollen and he would not let Amber hold it, Amber assumed that the injury was not serious because D.R. did not cry and was easy to soothe.

Describing how D.R. broke his leg, Amber explained that she had given D.R. a bath and then put him on the bed to dress him.  She was moving D.R.'s lotion and hydrocortisone when D.R. leaned back, lost his balance, and flipped off the bed.  The beds at St. Anne's are low to the ground; D.R. fell about two feet onto the carpet.  There was no evidence that the fall was anything but an accident, and a complete skeletal survey revealed no other injuries or fractures.

After sending D.R. for an x-ray, the pediatrician determined that D.R.'s leg was broken and she sent Amber and D.R. to Children's Hospital to have the leg cast.  At Children's Hospital, the doctor told Amber not to get the cast wet and that it would need to stay on.  The discharge instructions included directives to keep the cast dry, to avoid

4

"stick[ing] things in [the] cast" because of the potential for skin infection, and to "[n]ever try to remove [the] cast yourself." Amber also signed a safety plan in which she agreed to contact the pediatrician or seek medical attention immediately if D.R. was in any pain or discomfort. Three days later, however, when the social worker called Amber to follow up, Amber told her that, because the cast was uncomfortable for D.R., Amber wet the cast and took it off. She explained later that she "used a ruler and wiggled it around the cast and slid it off." Amber's understanding of the pediatrician's instructions was that, although casting was the preferred treatment, Amber could use warm compresses as an alternative treatment for D.R.'s leg, and Amber in fact used warm compresses to treat the broken leg after removing the cast. The pediatrician denied suggesting that Amber could use warm compresses as an alternative treatment.

The psychiatrist who evaluated Amber before the disposition hearing explained why Amber had removed the cast: "[Amber] reasoned that her son had made significant physical strides as of late, building the strength to pull up his own weight and stand, for instance. She was concerned that the cast was, in essence, stunting his normal neurological growth because she was watching him struggle to stand in his crib given the awkward new weight of the cast. The motherly intention to alleviate the suffering of her child, a very primitive inclination, was certainly present in [Amber's] mind . . . ." The psychiatrist did not believe Amber would be able to "conjure the notion of a warm compress on her own given her general unfamiliarity with medicine," but rather the psychiatrist believed that Amber had misunderstood some reference by the pediatrician to a warm compress. Amber had a follow-up appointment scheduled with the pediatrician for two days after she removed the cast.

After learning that Amber had removed D.R.'s cast, the social worker urged Amber to return to Children's Hospital, but Amber told her that the pediatrician said the leg would heal on its own and she did not want to return to Children's Hospital. The social worker then spoke to a Children's Hospital social worker who reported that the doctors said they would need to re-cast D.R.'s leg that day. Amber told the social worker that she wanted a second opinion, and she took D.R. to Hollywood Presbyterian Hospital.

5

Amber did not tell the staff at Hollywood Presbyterian Hospital that D.R. had broken his leg, but she did allow the social worker to provide D.R.'s medical history. Amber asked for a new x-ray to confirm the fractures, but because D.R. already had two x-rays at Children's Hospital and Hollywood Presbyterian Hospital did not have an orthopedic specialty, the triage nurse recommended taking D.R. back to Children's Hospital. Amber continued to ask for another x-ray. While waiting for the doctor at Hollywood Presbyterian Hospital, the social worker decided to detain D.R. The doctor cleared D.R. for transportation to Children's Hospital, and the social worker took him there.

At Children's Hospital, a new x-ray showed no additional injury, but the doctors explained that removing the original cast could have seriously injured D.R., either by reinjuring the fractures or by causing serious skin infections. D.R.'s leg was re-cast. When D.R. left the hospital he was placed with foster parents with whom he remained through the disposition hearing.

On July 31, 2014 the Department filed a section 300, subdivision (b), petition on behalf of D.R., alleging medical neglect. On September 24, 2014 the court sustained the petition (after minor amendment) and found that D.R. was a minor described in section 300, subdivision (b).[3] That same day the court ordered that a psychiatrist and a psychologist evaluate Amber under Evidence Code section 730.

E.     *The Disposition Hearing*

The disposition hearing was continued three times: once while the court waited for the reports by the psychiatrist and the psychologist, once at Amber's request because her attorney was ill, and once because the Department's attorney was ill and the court still had not received the psychologist's report. On April 13, 2015, almost six months after

---

[3]     Section 300, subdivision (b), allows the juvenile court to adjudge a child a dependent of the juvenile court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . the willful or negligent failure of the parent . . . to provide the child with adequate . . . medical treatment."

the court had made its jurisdiction findings, the court proceeded with the disposition hearing.

The psychiatrist's report explained that Amber "suffered symptoms in the past which are consistent with a diagnosis of major depressive disorder of moderate severity," and that she "also meets criteria for polysubstance dependence," which is "in full sustained remission" because Amber had not been using drugs since she became pregnant. "While it is clear that she made some ill advised parenting decisions (leaving her son with the maternal grandmother and placing him on unsupported surfaces), there is no evidence to suggest she was deluded, psychotic, or malicious." Amber expressed "appropriate regret at having relied on her mother to watch her son." With regard to removing D.R.'s cast, "[Amber] reported learning from her mistake and to always follow the advice of her son's doctors." Because Amber did not experience "adequate mothering [on] which to model her own parenting skills," "despite having the best and most loving intentions, she has a great deal to learn about parenting." The report concluded that Amber "has the potential, with continued guidance, to be an adequate parent for her young son." The court had still not received the psychologist's report.

At the time of the disposition hearing, Amber was attending weekly dyadic therapy at Children's Hospital. "The focus of dyadic therapy is to address how the child has been impacted by trauma, understanding the development stages of the child, and strengthening the parent child bond." According to the doctor providing the dyadic therapy, Amber "is doing well overall" and "is open to receiving guidance, is learning about age appropriate play and [is] learning how to read [D.R.'s] cues." Amber was also enrolled in individual counseling at the Children's Collective.

Amber submitted undisputed evidence that she had completed 52 weeks of parenting education and 61 mental-health treatment sessions at St. Anne's, and participated in an additional 12-week parenting program at the Los Angeles Centers for Alcohol & Drug Abuse (L.A. CADA). As of April 10, 2015, Amber had attended 66 substance abuse groups at L.A. CADA, which included 19 parenting classes. She was randomly tested for "all illicit drugs" on 11 occasions and "all results were negative for

7

all substances." L.A. CADA reported that Amber "is demonstrating that she wants to continue working on her recovery process in order [to] ensure she maintains a healthy living environment for herself and her child." The court took note of the work that Amber had done.

Amber attended all of her twice-weekly visits with D.R. The Department had "some concerns that Amber brings toys for [D.R.] that are not age appropriate, such as construction paper, crayons, and coloring books." But D.R.'s foster parent reported "that visits go well and that [D.R.] is excited to see Amber."

According to the Department's Multidisciplinary Assessment Team Summary of Findings Report, D.R.'s leg "appear[ed] to have fully healed" and D.R. was "meeting and exceeding developmental expectations." The MAT report described D.R. as a "happy, social, lovable little boy," but explained that the trauma related to having been cared for by Amber's mother and the events surrounding his broken leg could potentially "have a significant impact on his future development and mental health." The MAT report concluded, "While [D.R.] does not display any trauma symptoms or developmental concerns at this time, these incidents [of trauma] can be considered risk factors and he should therefore be monitored by medical and mental health professionals over the next several years to ensure his continued healthy development."

At the disposition hearing, D.R. joined Amber's request that the court return him to her care. Counsel for D.R. argued that "the initial injury was an accident" that "could have happened to any parent," and counsel reminded the court that Amber had never injured D.R. on purpose and the complete skeletal survey disclosed no other injuries or fractures.

Amber's testimony for the most part was consistent with the psychiatrist's report. There is no evidence that Amber let her mother babysit D.R. since the June 2014 incident, and Amber testified that she would not let her mother babysit D.R. again. Amber said that she removed D.R.'s cast when she "had gotten to feel very, very down," and she was worried that the cast was doing more harm than good. She expressed remorse for removing the cast, and said that in the future she would "resolve with the

8

doctor any confusion that [she has] so that [she] can follow through with the medical advice and not go against medical advice."

At the time Amber met with the psychiatrist who wrote the Evidence Code section 730 report, she was living at St. Anne's and taking the anti-depressant medication the psychiatrist at St. Anne's prescribed. The report recommended Amber "continue[ ] treatment with medication and weekly therapy in order . . . to remain free of recurrent depressive symptoms." But by the disposition hearing Amber had moved out of St. Anne's and into Section 8 housing, and she was no longer taking the anti-depressant medication. Amber had decided to treat her depression with individual and group counseling instead of medication, and reported no longer feeling the sorrow or depression she felt before. Nevertheless, Amber testified that if a doctor told her she needed to take medication, she would do so.

Amber's St. Anne's case manager had advised Amber not to leave St. Anne's because the case manager thought Amber could use the resources at St. Anne's to help her case in the dependency proceedings. Amber reasoned, however, that because she was only six months away from reaching the two-year limit for staying at St. Anne's (which is a transitional housing facility) she should not pass up the opportunity to move into more permanent housing. Amber testified that she left St. Anne's in order to become independent. At the time of the disposition hearing, Amber was working 32 hours a week and taking classes at Los Angeles Trade Tech Community College. She testified that she would make childcare arrangements with family members (other than her mother) and would receive additional help with childcare through a public program called Crystal Stairs.

The Department noted that Amber had been "off of her medication since her discharge from mental health services at St. Anne's." The Department recommended that D.R. remain in foster care because Amber "has not completed her dyadic parenting, is not enrolled in psychiatric services and is in the beginning stages of counseling with her new therapist."

9

The court commended Amber on her progress but did not "yet believe [that D.R. would be] safe in [her] care." The court explained, "We are here because of an accident that had some relationship to neglect. [D.R.] was hurt. And then I sustained counts [in the petition] relating to your medical neglect of him and not following doctor's orders." In particular, the court was concerned that Amber was no longer seeing a psychiatrist or taking the medicine prescribed for her by the psychiatrist at St. Anne's, that she had moved out of the supportive environment at St. Anne's against the St. Anne's staff's recommendation, and that she had no concrete plan for childcare were D.R. returned to her care. The court found that Amber had a continuing pattern of ignoring safety and medical advice. The court concluded, "I don't want this to be punitive today because you have done such a good job, but you need to do more before I feel that [D.R.] is safe in your care."

F.      *The Appeal*

On April 13, 2015, the same day the court entered its disposition order, Amber filed a timely notice of appeal.[4] We liberally construe the notice of appeal as an appeal from the court's jurisdiction findings and disposition order. (See *In re Joshua S.* (2007) 41 Cal.4th 261, 272; *In re F.A.* (2015) 241 Cal.App.4th 107, 116, fn. 7.) Nevertheless, despite stating that she filed a "notice of appeal from the juvenile court's jurisdictional and dispositional orders," Amber presents no argument on appeal challenging the court's jurisdiction findings. Amber's sole argument on appeal is that substantial evidence does not support the court's disposition order removing D.R.[5]

---

[4]      Section One of the preprinted notice of appeal states: "I appeal from the findings and orders of the court (*specify date of order or describe order*)." Underneath that preprinted text, Amber wrote: "Today, 04-13-2015 I appeared in court. Monday, 04-13-2015 I have been denied the possibility of receiving c[u]stody of my son because of disorderly conduct."

[5]      Amber also challenges only the disposition order's ruling on removal; she does not make any argument challenging the other rulings included in that order.

## DISCUSSION

"After finding that a child is a person described in Section 300, the [juvenile] court . . . hear[s] evidence on the question of the proper disposition to be made of the child." (§ 358, subd. (a); see *In re Hailey T.* (2012) 212 Cal.App.4th 139, 145 ["[a]fter the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing"].) The disposition may be based on evidence apart from the evidence considered to sustain the petition, and, in fact, California Rules of Court, rule 5.690 requires that the court "receive in evidence and consider" a wide range of information about the family and "any relevant evidence offered by petitioner, the child, or the parent or guardian." (Cal. Rules of Court, rule 5.690; see *In re Briana V.* (2015) 236 Cal.App.4th 297, 311 ["[a]t disposition, the juvenile court is not limited to the content of the sustained petition when it considers what dispositional orders would be in the best interests of the children," and "[i]nstead, the court may consider the evidence as a whole"]; *In re Madison T.* (2013) 213 Cal.App.4th 1506, 1509 ["'[a]t the . . . dispositional phase, any relevant evidence including hearsay shall be admitted pursuant to section 358, subdivision (b) to help the court determine the child's best interests'"]; *In re Vincent G.* (2008) 162 Cal.App.4th 238, 243 [evidence that "would be inadmissible at a jurisdiction hearing . . . may nevertheless be considered at a dispositional hearing"]; *In re Rodger H.* (1991) 228 Cal.App.3d 1174, 1183 ["facts of family history and behavior, that shed light on the charged conduct alleged in a sustained petition," need not "be expressly pleaded before they may be shown at a disposition hearing"].)

Although the disposition order may include removal, "[s]ection 361, subdivision (c)(1) limits the ability of the juvenile court to remove a child from the physical custody of his or her parents. To do so, the juvenile court must find by clear and convincing evidence that '[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor' 'and there are no reasonable means by which the minor's physical health can be protected . . . [.]' This is a heightened standard of proof from the required preponderance of evidence standard for taking

11

jurisdiction over a child." (*In re A.E.* (2014) 228 Cal.App.4th 820, 825; see *In re Isayah C.* (2004) 118 Cal.App.4th 684, 695 ["[c]lear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt"].) "At the same time, [under section 361, subdivision (c)(1)] jurisdictional findings are prima facie evidence the child cannot safely remain in the home." (*In re A.E.*, at p. 825.)

"We review the juvenile court's . . . disposition order for substantial evidence. [Citation]  Under this standard '[w]e review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible.'" (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384; see *In re Isayah C., supra,* 118 Cal.App.4th at p. 694 ["[w]e review the record in the light most favorable to the trial court's order to determine whether there is substantial evidence from which a reasonable trier of fact could make the necessary findings *based on the clear and convincing evidence standard*"].)  """"The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.""""  (*In re Albert T.* (2006) 144 Cal.App.4th 207, 216.)

Here, in addition to the evidence of medical neglect, there is substantial evidence to support a finding that Amber's continuing pattern of ignoring safety and medical advice put D.R. in substantial danger while in Amber's care.  Despite Amber's best intentions for D.R., she has put D.R.'s physical health and well-being in danger by (1) allowing her mother to babysit him after agreeing with the St. Anne's staff that she would not put D.R. in her mother's care; (2) putting him on a raised surface where he could (and did) fall and hurt himself after the social worker advised her of the risk of injury; and (3) ignoring the doctor's instructions not to wet or remove D.R.'s cast and removing the cast herself.  We agree with the Department that there is substantial evidence of a "problematic pattern of disregarding child-safety directives" in support of the court's finding by clear and convincing evidence that D.R. faced a risk of serious

physical harm in Amber's care.[6]  This is especially true because D.R. was younger than one-and-a-half years old at disposition and "infancy [is] an inherently hazardous period of life." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 825; see *id.* at p. 824 ["[c]ases finding a substantial physical danger . . . [include those] involv[ing] . . . children of such tender years that the absence of adequate supervision and care poses an inherent risk to their physical health and safety"]; accord, *In re Drake M*. (2012) 211 Cal.App.4th 754, 767.)

In re Henry V. (2004) 119 Cal.App.4th 522, cited by Amber, is distinguishable.  In that case the court held that the juvenile court had erred in removing the child pending a bonding study that could have been performed with the child still in the family home. (*Id.* at pp. 529-530.)  Amber suggests that the juvenile court here could have left D.R. in her home while the court was waiting for the additional Evidence Code section 730 evaluation from the psychologist.  Amber argues that "there was no suggestion the additional 730 evaluation, for which the court had already continued the disposition hearing twice, could not have been performed while [D.R.] was living with Amber with appropriate maintenance services."  The court, however, ultimately proceeded to disposition without the psychologist's report.  The court did not rely on the lack of a psychologist's report to remove D.R, nor did the court remove D.R. at disposition pending any study or report.

Amber appears to argue that the court should not have removed D.R. on the ground that Amber was not taking medication to treat her depression, because there was no evidence that Amber "'need[ed] to take medication.'"  We agree with Amber that there is no substantial evidence to support removal based solely on Amber's

---

[6]     Thus, this case is distinguishable from those cases in which the courts have determined that there was no substantial evidence to support jurisdiction findings based on an isolated incident for which the parent or parents were remorseful.  (See, e.g., *In re A.E.*, *supra*, 228 Cal.App.4th at p. 822 ["single occasion" of spanking child with a belt]; *In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1396 [single incident of allowing an intoxicated friend to take care of twin toddlers].)

discontinuing her use of anti-depressants. The only evidence that Amber's depression ever affected her care of D.R. was her testimony that she felt "very, very down" when she removed D.R.'s cast. Amber's decision to stop psychiatric treatment against the recommendation of the Evidence Code section 730 evaluator, however, is additional evidence of a continuing pattern of disregarding medical advice. As the juvenile court stated at the hearing, "Although you claim now that, with respect to your child, you will be willing to follow doctor's orders, you are still not willing to follow doctor's orders as to your own psychiatric issues."

Finally, Amber argues that "there was no factual showing that Amber was so abusive and neglectful of [D.R.] that he could not be placed with [her] with reasonable services provided, including unannounced home visits." Unannounced home visits, however, would not protect D.R. from the particular type of dangers that he had already faced in Amber's care, and that the court determined there was a substantial danger he might face again. Unless fortuitously timed, unannounced home visits would not have protected D.R. from the immediate dangers of falling from a raised surface or having his cast removed against medical advice, nor would they have protected him from Amber's abusive mother. We agree with the Department that "[unannounced] visits would not adequately protect [D.R.] from . . . [Amber's] fail[ure] to recognize and respond to genuine emergencies." Therefore, substantial evidence supports the court's finding by clear and convincing evidence that "there [was] no reasonable means to protect [D.R.] without removal."

## DISPOSITION

The juvenile court's jurisdiction findings and disposition order are affirmed.


                    SEGAL, J.

We concur:


                    PERLUSS, P. J.                                    ZELON, J.

14