Filed 8/20/19; Certified for Publication 9/12/19 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re L.M., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D075120 |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3761B) |
| v. | |
| D.M., | |
| Defendant and Appellant; | |
| KATE K. et al., | |
| Objectors and Appellants; | |
| JOHN E. et al., | |
| Respondents. | |

APPEAL from orders of the Superior Court of San Diego County, Michael Popkins, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant, D.M.

Thomas E. Montgomery, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

Amy Z. Tobin, under appointment by the Court of Appeal, for Minor.

James Legal Group, Kelly A. James for Objectors and Appellants, Kate K. and Jaime S.

Gary S. Plavnick for Respondents, John E. and Rita E.

Kate K. and Jaime S. are the de facto parents of L.M., who was placed in their foster care soon after birth. They challenge the juvenile court's order, made when L.M. was 10-months old, removing her from their care and placing her with Rita and John E. (the E.'s), who had previously adopted L.M.'s sister, V.E.

The juvenile court had an immensely difficult decision to make in this case. As the court recognized, Kate and Jaime had provided L.M. excellent care for essentially her entire 10-month life. Yet, the E.'s are also "good people and excellent parents as well" and have adopted L.M.'s sister. L.M. thrives in both environments.

The tipping point was the relationship between L.M. and V.E., who "hit it off immediately" and "simply love each other." An experienced social worker testified that these girls "are so attached to each other. . . . It's nothing like I've ever seen."

After five days of evidence including expert testimony, and in a sensitive and thoughtful ruling, the court found that it is in L.M.'s best interest to be removed from Kate and Jaime's care so that she may be placed with the E.'s.

2

On appeal, Kate and Jaime assert that the juvenile court erred by applying the "wrong" legal standard. Invoking rights afforded prospective adoptive parents under Welfare and Institutions Code section 366.26, subdivision (n) [hereafter, § 366.26(n)],[1] they contend the court first had to determine if it was in L.M.'s best interest to be *removed* from their care, without regard to whether it was in L.M.'s best interest to be *placed* with the E.'s. Kate and Jaime further assert that under this standard—focusing only on grounds for removal—the order must be reversed because the juvenile court recognized that they provided excellent care and did nothing wrong.

Placing a child in the best adoptive home is among the most important rulings in dependency. The overriding goal, embodied in the best-interest standard, is to maximize the child's opportunity to develop into a healthy, well-adjusted adult. The question in any given case is whether removal from a current placement is in the child's best interest? The answer depends on drawing reasonable inferences, in large part looking to the future, about how the child will develop, mature, and thrive in both the current and proposed placement. Where, as here, there are two good competing placements, determining whether removal is in the child's best interest necessarily requires the court to evaluate which placement best serves these goals.

Accordingly, even assuming that Kate and Jaime were entitled to rights afforded to prospective adoptive parents, the juvenile court applied the correct legal standard, and we affirm because the court's findings are supported by substantial evidence.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

3

FACTUAL AND PROCEDURAL BACKGROUND

A.     *L.M.'s Sister, V.E.*

Although L.M. was born in February 2018, the relevant facts begin four years earlier in December 2013 when her half-sister V.E. tested positive for methamphetamine at birth.  At 10-weeks of age, the San Diego County Health and Human Services Agency (Agency) placed V.E. with the E.'s.  In October 2015 the E.'s adopted V.E.

V.E. is African-American; the E.'s are Caucasian.[2]  After adopting V.E. and learning more about transracial adoptions, the E.'s moved from San Diego to Tampa, Florida, which is 26 percent African-American.  The E.'s reside in a multiracial neighborhood there.  V.E. attends a racially diverse school, and the family attends a church having a predominantly African-American congregation.

B.     *L.M.'s Dependency and Placement with Kate and Jaime*

At birth L.M. tested presumptively positive for methamphetamine.  L.M.'s mother (Mother) was homeless.  L.M.'s biological father was in custody on weapons and drug charges.[3]

The Agency ordinarily attempts to place a child with a sibling who had been previously removed from the same parents.  Two days after L.M. was born, in response to the Agency's inquiry, the E.'s stated they wanted L.M. placed with them.  However, the

---

[2]     Kate and Jaime are also Caucasian.

[3]     L.M. and V.E. have the same mother, but different fathers.

4

Agency could not do so until Florida licensed the E.'s as foster parents. The E.'s immediately began doing the things necessary to become licensed in Florida.

The Agency placed L.M. with Kate and Jaime. It did not take long for L.M. to capture their hearts. By March, Kate and Jaime told the Agency they wanted to adopt her.[4]

C.    *Sibling Visits and Competing Placement Requests*

In mid-May, Rita and V.E. traveled from Tampa to San Diego to visit L.M. The visit went well. Later that month, the E.'s told Kate they wanted to adopt L.M.

In early June, Kate and Jaime filed a request to be designated L.M.'s de facto parents.[5] Later that month, the juvenile court granted Kate and Jaime de facto parent status, declared L.M. a dependent, removed her from her parents' custody, and declined to grant the parents reunification services.

From July through September, the Agency facilitated monthly visits between L.M. and the E.'s, including four-year-old V.E. The visits, which included several lasting overnight, went well; L.M. was comfortable being with the E.'s and V.E. John explained how L.M. and V.E. interacted, stating:

---

[4]    Hereafter, dates are in 2018 unless otherwise specified.

[5]    A de facto parent is "a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period." (Cal. Rules of Court, rule 5.502(10).) De facto parents have certain procedural rights in dependency proceedings. (*In re B.G.* (1974) 11 Cal.3d 679, 693; *In re P.L.* (2005) 134 Cal.App.4th 1357, 1361; *R.H. v. Superior Court* (2012) 209 Cal.App.4th 364, 371.)

"It's interesting to watch when [L.M.] sees [V.E.] and [V.E.] moves around the room, watching [L.M.'s] head track where [V.E.] goes. And you can see her smile. You can just hear [V.E.] giggling and all that. And it's just one of those feelings that makes the hassle, the time, and all that all worth it because you hear the joy of a child's laughter. You see the smiles on their faces. And it's . . . an awesome thing."

D.      *Pretrial Developments and Proceedings*

To become licensed foster parents in Florida, the E.'s completed parenting class, passed a criminal background check, and showed financial stability. The Florida department of children and families inspected their home to ensure it was child-safe and interviewed their references. The references "all spoke very highly of the [E.'s] and thought they would be amazing foster parents and thought they were amazing parents to [V.E.]. They all talked about how [V.E.] was very well-mannered and how the [E.'s] were very active in their church. None of the references that were provided had any concerns."

By early October, Florida licensed the E.'s as foster parents. The Agency notified the parties it intended to place L.M. with them.

Meanwhile, in June police had arrested Mother on charges including vehicle theft. Mother had not visited L.M. since birth. And in July, police had arrested L.M.'s father, D.M., (Father) on charges including robbery. Since the date of her birth, Father had visited L.M. once.

In October, the juvenile court considered three interrelated motions: (1) The Agency asked the court to terminate parental rights, order a permanent plan of adoption under section 366.26, and place L.M. with the E.'s.; (2) the E.'s and V.E. filed a request

6

under section 388 to change L.M.'s placement to their care[6]; and (3) Kate and Jaime filed a request under section 366.26(n) to be designated prospective adoptive parents.[7]

In November, the juvenile court conducted a hearing to address the order in which the court would rule on these issues. Mother and Father submitted on the Agency's recommendation to terminate their parental rights. However, the Agency asked the court to defer doing so. This would retain the parents' standing to have a voice in placement. The court concurred and continued the hearing on termination of parental rights. The court ruled that Kate and Jaime's request to be designated prospective adoptive parents was premature because it was not cognizable until after parental rights were terminated. Nevertheless, emphasizing the "need for a secure ruling on appeal," L.M.'s lawyer urged the court to take the most conservative approach, giving Kate and Jaime the benefit of prospective adoptive parent status—even without designating them as such—by placing upon the Agency the burden to show it was in L.M.'s best interest to be removed from their care. The court agreed "out of consideration and respect for the de facto parents, and the fact that [L.M.] has lived with them for, pretty much, most of her life."

The court stated that although the issues would be tried "simultaneously," it would first decide removal. If removal was warranted, the court would next decide the E.'s

---

6    Generally, section 388 provides for modification of juvenile court orders when changed circumstances show that modification of a previous order is in the child's best interest. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.)

7    A prospective adoptive parent is a caretaker with whom a dependent child has lived for at least six months, who expresses a commitment to adopt the child, and has taken at least one step to facilitate the adoption process. (§ 366.26(n)(1) & (2).)

motion for placement.  Third, the court would decide whether to terminate parental rights. Last, the court would consider Kate and Jaime's request to be designated prospective adoptive parents.

E.    *Trial*

    1.    *The Agency's case*

The E.'s and V.E. visited L.M. monthly from July through December, which included seven overnight visits.  L.M. displayed no emotional distress in transitioning between Kate and Jaime and the E.'s for these visits.  The visits quickly established a bond between L.M. and V.E.  Laura Chavis, the Agency's case worker assigned to L.M.'s care, explained:

> "Well, the visits—they're beautiful.  The girls are so attached to each other.  [L.M.] will actively look for [V.E.].  If—because [V.E.] is an active child.  So when she runs around, [L.M.] will follow her with her eyes.  She'll smile.  She'll point.  She wants to be with her sister.  You can see it.  It's nothing like I've ever seen in my ten years working in social services, that she knows that that's her sister.  The way she looks at her is nothing like I've seen before.
>
> "And [V.E.] loves to—you know, yesterday they had a tea party in the visit.  [V.E.] loves to give her kisses.  She reads her bedtime stories at the overnights.  [V.E.] was thrilled when they had overnights because they got to have little sleepovers.
>
> "And visits go really, really well.  And you can tell the girls have a really good relationship, and they have established a relationship during the 16 visits . . . ."

Chavis acknowledged that Kate and Jaime are excellent caregivers, testifying, "I can feel the love they have for the child."  "I do feel [that L.M.] loves them" and "looks at them in a parental role since they were caring for her on a day-to-day basis."  Chavis also

8

recognized that L.M. has a "secure attachment" to Kate and Jaime and has "flourished" in their care. Nevertheless, Chavis "strongly" believed it was in L.M.'s best interest "to have a sibling to grow up with, someone that shares her biology, her culture, her race . . . ." She explained, "I'm not just thinking about [L.M.] 9 months old. I'm thinking about [L.M.] when she's 5, when she's 10, when she's 17. I'm thinking long-term and permanency." Chavis added, "[G]iven the contentious relationship that's developed between the caregivers and [the E.'s] . . . I can almost guarantee these kids will never see each other again and not be able to grow up and have life experiences together, which is why I feel so strongly we need to place [L.M.] with her sister."

Henrietta Himelstein, a psychologist, observed L.M. interact with the E.'s and V.E. and saw no signs that L.M. experienced anxiety or distress. Dr. Himelstein opined that L.M. would not suffer trauma by being placed with the E.'s., in part because L.M. is already familiar with them. Moreover, a child who has a secure attachment with one caregiver is more open to being cared for by others. Thus, L.M.'s secure attachment to Kate and Jaime would actually ease a healthy transition to the E.'s. Although any move entails adjustments involving diet, bed time, and things of that nature, Dr. Himelstein believed that removing L.M. and placing her with the E.'s would "not be traumatizing at all." She also testified that growing up with a sibling of the same race and in an African-American neighborhood would benefit L.M.

Jantel Thomas, who is employed by the Florida department of children and families, expressed no concerns about the E.'s ability to provide appropriate care to L.M., nor about their commitment to adopt L.M. Thomas, herself African-American, thought it

9

would be "priceless" for L.M. to grow up with V.E. Thomas testified that social services, including mental health care, would be provided L.M. in Florida if needed.

2. *Kate and Jaime's case*

Kate and Jaime have had a stable relationship for seven years. Kate is a marriage and family therapist. Jaime, who holds a master's degree in clinical social work, stays home to care for L.M. L.M. has a loving relationship with both of them. Recognizing the importance of L.M.'s family and cultural connections, Jaime placed photographs of L.M.'s parents in her room. Kate and Jaime have also "made it a priority" for L.M. to frequently visit her paternal grandmother, who resides in San Diego. Kate and Jaime believe it is more important to maintain L.M.'s relationship with her grandmother than that with V.E.

Meaghan O'Connor is L.M.'s case manager. In her opinion, L.M. will "suffer trauma" if removed because L.M. has a healthy and secure attachment to Kate and Jaime and will not understand where or why they are gone. L.M. would suffer additional trauma from losing her relationship with her grandmother. Trauma causes sleep disturbances, gastrointestinal upset, and developmental regression. O'Connor testified that L.M.'s biological connection with a sibling does not outweigh her secure and healthy attachment to Kate and Jaime.

Juana Vaquero, a psychologist, conducted a "developmental evaluation" of L.M. Kate and Jaime reported that after L.M. visited the E.'s, she began waking up during the

night screaming. Dr. Vaquero opined that L.M. is having "some difficulties adjusting to changes."[8]

Michael Jones, a psychotherapist, testified that if a secure attachment between caregiver and child is disrupted, the child will suffer emotional and physical trauma. Moreover, the younger the child at the time of removal from a secure attachment, the more trauma.[9] Jones opined that L.M. is securely attached to Kate and Jaime and would be traumatized if removed from their care. This trauma would manifest in developmental regression and later in life, emotional and social difficulties. In his opinion, placing L.M. with V.E. "does not fix the trauma of this removal."[10]

3.    *The court's ruling*

After closing arguments, the court prefaced its ruling by recognizing the difficulty of its task:

> "When one becomes a judge, they send you to new judge orientation
> for a week, and then a little while after that, they send you to judge's
> college for two weeks. And then finally, if you get assigned to a[n]

---

[8]    On cross-examination Dr. Vaquero conceded there could be "other reasons aside from sibling visits" for L.M.'s sleep disturbances. Dr. Vaquero declined to opine on whether L.M. should be removed from Kate and Jaime's care.

[9]    Dr. Himelstein disagreed, stating that when a child under one-year old is removed, later in life the child does not even remember the first primary caregiver. "They don't remember. Do you remember when you were ten months old?"

[10]    On cross-examination, Jones conceded that when he was formerly employed as a social worker, he would strive to place a newborn with siblings to promote identity and cultural issues that are "a huge factor in self-esteem, functioning, social-emotional development, especially toward teenage years." He acknowledged there were no studies of long term effects, if any, from removing a child less than one year of age.

11

area of the law like dependency, they send you to primary assignment training for a week. None of those programs teach you how to make decisions like I have to make today.

"In making rulings like I have to make today is really the hardest part of this job. I recognize no matter how I rule, there will be people who will be devastated. And I take no joy in that."

The court commended Kate, Jaime, and the E's, and focused on the best-interest standard governing its decision:

"Prior to making my ruling, I want the record to reflect that this court finds that based on all the evidence, that [Kate] and [Jaime] have done an excellent job of taking care of [L.M.] I believe them both to be good people, and excellent parents. I also want the record to reflect that based on the evidence Mr. and Mrs. [E.] have taken excellent care of [V.E.] and when [L.M.] has visited with them, I find that they have taken excellent care of [L.M.] as well. I believe them both to be good people and excellent parents as well.

"With or without [V.E.] in the mix, either of these two families would be an ideal family for [L.M.]. The issue here . . . is not whether one family is better than the other, the fact is they are both excellent. Both of them. The issue here for me to decide is not what is best for [Kate] or [Jaime] or what is best for Mr. or Mrs. [E.] or even what is best for [V.E.], what I am here to decide is what is in the best interest of [L.M.]."

Consistent with its pretrial ruling, the court stated that it was the Agency's burden to show that removal is in L.M.'s best interest. However, in a departure from that pretrial plan to separately consider removal first, the court stated, "I cannot and I do not believe I should separate removal from placement, because I have to consider all the facts involved, as to what is in [L.M.'s] best interest. And that would include considering what the future placement would be. . . . I have to consider the big picture and all the evidence in this case."

The court found that it is in L.M.'s best interest as she grows older to live with V.E., an older sister of her same race. The court found Thomas's testimony on this point to be persuasive. The court recognized the importance of L.M.'s relationship with her grandmother, who "can fulfill some of that need, some of that void for racial mirroring for [L.M.]." However, the court noted there is a "significant generational difference" between L.M. and her grandmother that is not present in L.M.'s relationship with V.E. The court further explained:

> "[V.E.] as a young four-year old has already taken on the role of big sister. It can be expected that that role will only get better as the children grow up. Fast forwarding into the future by the time [L.M.] is 15 and [V.E.] is 19, one can only imagine how much value and benefit [L.M.] will have in her life for having a big sister to confide in . . . . "

Of the experts, the court found Dr. Himelstein was the "most credible." The court recognized there would be adjustments for L.M. in placing her with the E.'s, but also noted, "We move children from foster families all the time."

In sum, finding that the relationship between [L.M.] and [V.E.] is "substantial" and "compelling," the court found "by clear and convincing evidence that it is in [L.M.'s] best interest to be removed from her current caregivers and placed in the home with her sister, [V.E.]."

After again thanking Kate and Jaime for being "fantastic parents" who have done "nothing wrong," the court emphasized that its decision "is based on what I believe in the overall picture, not just today, but for the rest of her minority, is in L.M.'s best interest." The court authorized the Agency to remove L.M. from Kate and Jaime's care and granted

13

the E.'s section 388 motion to have L.M. placed with them.  The court terminated parental rights and ordered a permanent plan of adoption.

## DISCUSSION

A.    *The Juvenile Court Correctly Applied the Best Interest Standard*

    1.    *The parties' contentions*

Kate and Jaime contend they qualified as L.M.'s prospective adoptive parents under section 366.26(n) and, therefore, the court should have granted their request for that designation at the outset.  They argue that if the court had done so, L.M. could not have been placed with the E.'s without the court first separately determining that removing L.M. from their care was in her best interest.  In short, Kate and Jaime contend the court prejudicially erred by considering removal and placement together.[11]

The parties debate whether the juvenile court properly deferred deciding whether to designate Kate and Jaime prospective adoptive parents until after terminating parental rights.  Kate and Jaime assert that the juvenile court was required to decide this issue first because their status as prospective adoptive parents controls the applicable "standard and burden of proof."  In contrast, the Agency and the E.'s contend the court correctly deferred this decision to the end of the case because section 366.26(n) does not apply until after parental rights are terminated.  More specifically, the Agency asserts there is a

---

[11]    Father's attorney filed an opening brief; however, he does not challenge the order terminating his parental rights.  He acknowledges that as a result, he lacks standing to challenge the order placing L.M.  He requests that we consider his brief "akin to that of amicus curiae" on behalf of Kate and Jaime.  Since the parties have not objected to that request, we will consider his comments.

14

split of authority on this point, and asks us to follow *In re Jayden M.* (2014) 228 Cal.App.4th 1452, 1458 [notice requirements under section 366.26(n) not applicable prior to the termination of parental rights] rather than *In re M.M.* (2015) 235 Cal.App.4th 54, 65 (*M.M.*) [requiring notice and hearing under section 366.26(n) before parental rights are terminated].  The Agency further asserts that to the extent the juvenile court has discretion on this issue, the court acted within its discretion because by postponing a ruling terminating parental rights, the parents retained standing to contest their daughter's placement.

It is unnecessary for us to resolve those issues.  The court did not designate Kate and Jaime as prospective adoptive parents.  Therefore, we need not consider the Agency's contention that doing so before terminating parental rights would be error.  Nor need we address Kate and Jaime's contention that the court erred in not designating them prospective adoptive parents.  Even assuming without deciding that it was error, it was harmless because the court afforded Kate and Jaime rights they claimed as prospective adoptive parents.  For example, designated prospective adoptive parents have the right to "offer evidence, examine witnesses, provide the court with legal authorities and make arguments to the court."  (*Wayne F. v. Superior Court* (2006) 145 Cal.App.4th 1331, 1334 (*Wayne F.*).)  Through counsel, Kate and Jaime exercised all these rights by examining witnesses, offering expert witness testimony, and giving closing argument.  Furthermore, under section 366.26(n)(3)(B), the child may not be removed from the designated prospective adoptive parent's care unless the court finds removal is in the child's best interest.  Here, the juvenile court afforded Kate and Jaime this right, requiring

15

the Agency prove removal was in L.M.'s best interest. Indeed, in one sense, the court imposed an even greater burden on the Agency than that imposed by section 366.26(n). Under section 366.26(n)(3), the Agency's burden of proof is preponderance of the evidence. (*T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 45 (*T.W.*).) However, here the court found "by clear and convincing evidence" that removal is in L.M.'s best interest.

2. *The statutory interpretation issue*

Kate and Jaime frame their appeal by asserting the court applied the "wrong" legal standard. As we have explained, however, the court applied the best-interest standard applicable to prospective adoptive parents, the same standard Kate and Jaime urged the court to apply. Their argument really is that the court erroneously applied that standard by considering L.M.'s proposed *placement* when section 366.26(n)(3) required the court to determine whether "*removal* is in the child's best interest." (Italics added.) Thus, the issue is one of statutory interpretation. In determining whether "removal is in the child's best interest" under section 366.26(n)(3)(B), may a court consider the proposed placement?

"[I]n construing a statute we ascertain the Legislature's intent in order to effectuate the law's purpose. [Citation.] We must look to the statute's words and give them 'their usual and ordinary meaning.' [Citation.] 'The statute's plain meaning controls the court's interpretation unless its words are ambiguous.' [Citations.] 'If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as

16

the statute's purpose, legislative history, and public policy.'" (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527.)  We review the issue de novo.  (*Ibid*.)

> 3. *The court may consider future placement in deciding whether removal is in the child's best interest under section 366.26(n)(3)(B).*

Under section 366.26(n)(3), "prior to a change in placement" removing a dependent child from the prospective adoptive parent, the child welfare agency must give notice of such intended action.  The prospective adoptive parent may object to the proposed removal, triggering a hearing in which the court—after making the threshold determination that the objector meets the qualifications of a prospective adoptive parent, may order the removal of the child only if "the court finds that removal is in the child's best interest." (§ 366.26, subd. (n)(3)(B).)

"The purpose of the California dependency system is to provide maximum safety and protection for dependent children, and to ensure their physical and emotional well-being. (§ 300.2.)  The Legislature has declared it is state policy to facilitate the proper placement of every child in residential care in a placement that is in the best interests of the child." (*T.W.*, *supra*, 203 Cal.App.4th at pp. 42-43.)

In furtherance of this policy, the Legislature enacted section 366.26(n) "to strengthen the juvenile court's oversight and to protect the stability of children after parental rights are terminated . . . ." (*T.W.*, *supra*, 203 Cal.App.4th at p. 44.)  The statute addresses a legislative concern that an unjustified agency action in removing a child from a long-term caregiver might not be in the child's best interest.  (*State Department of Social Services v. Superior Court* (2008) 162 Cal.App.4th 273, 284 (*State Department*).)

17

Kate and Jaime assert that "removal" and "placement" have different meanings, the Legislature did not intend to use them interchangeably, and therefore the court erred by considering L.M.'s interests in being placed with the E.'s rather than whether removal from their care was warranted. We agree that "removal" and "placement" are not synonymous. (*T.W.*, *supra*, 203 Cal.App.4th at p. 45.) However, section 366.26(n)(3)(B) does not direct the court to decide "removal" in a vacuum. Rather, the statute provides the court must determine whether removal "is in the child's best interest." (§ 366.26(n)(3).)

Thus, the best-interest standard is what drives a decision whether to remove under section 366.26(n)(3)(B). In determining the child's best interest, the dependency court "must consider the minor's current circumstances." (*State Department*, *supra*, 162 Cal.App.4th at p. 286.) For example, in *In re F.A.* (2015) 241 Cal.App.4th 107, initial foster parents filed a petition seeking return of a child who had been erroneously removed from their care. Even though the child welfare agency admitted that the removal was erroneous, that did not necessarily establish that returning the child to that home was in her best interest because she spent 100 days with other caregivers who provided excellent care in which she flourished. (*Id.* at pp. 109-110.) Applying these same considerations here, the court could properly consider L.M.'s "current circumstances," including her sibling bond and her relationship with the E.'s.

Moreover, a court " 'should avail itself of all evidence which might bear on the child's best interest.' " (*In re Emily D.* (2015) 234 Cal.App.4th 438, 446.) The E.'s ability to provide L.M. a sibling relationship in a loving home directly bears on whether L.M.'s

18

best interests are furthered by removal.  Additionally, the purpose of the best interest standard is to "maximize a child's opportunity to develop into a stable, well-adjusted adult."  (*Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 704.)  Thus, in deciding what is in the child's best interest, the court properly considers the long-term nurturing and growth of the child, as well as the child's future physical, mental, and emotional needs.  (*In Interest of B.T.* (Iowa Ct. App. 2017) 894 N.W.2d 29, 33.)  In this sense, the best interest standard is necessarily forward looking.  As applied here, where L.M.'s future includes a sibling relationship with V.E., the court properly considered future placement with V.E. in determining whether L.M.'s best interests compelled removal.

Although our conclusion is required by the statute's text, it is also supported by legislative history.  In 2005, the Legislature added subdivision (n) to section 366.26 by way of Senate Bill No. 218.  (*Wayne F.*, *supra*, 145 Cal.App.4th at p. 1336-1337.)  A bill analysis prepared for the Senate Judiciary Committee states that the legislation is intended to provide judicial oversight of an agency's recommendation to remove *and* place the child with a different person:

> "The sponsor contends that children who have lived for long periods of time with their caretakers could be psychologically harmed by being moved to a different home pending a petition for adoption. Their proposed solution is to require that when the D[epartment of] S[ocial] S[ervices] or the licensed adoption agency recommends that a child *be removed* from a caretaker who wishes to adopt the child, *only to be adopted by a different person*, *that recommendation* should be reviewed by the dependency court."  (Senate Com. on Judiciary, analysis of Sen. Bill No. 218 (2005-2006 Reg. Sess.) as amended Apr. 7, 2005, p. 4, italics added.)

19

This same bill analysis, with remarkable prescience of the circumstances here, indicates that "removal" as used in section 366.26(n)(3)(B) is not a limit on the best-interest inquiry, but rather a timing provision:

> "There may be a number of reasons why the . . . agency may wish to remove the child from the caretaker's home and place him or her in another home, such as . . . the home of another set of prospective adoptive parents who appear to be more suitable for the adoption. . . .

> "However, SB 218 recognizes that there could be reasons why a child should not be removed from a caretaker's home, and those reasons could amount to removal not being in the best interest of the child. Therefore, rather than have the child *removed and placed elsewhere first*, pending a review of the department's decision which could only be challenged using an abuse of discretion standard, this bill would establish a notice and hearing procedure *prior to removal*." (Senate Com. on Judiciary, analysis of Sen. Bill No. 218 (2005-2006 Reg. Sess.) as amended Apr. 7, 2005, p. 6, italics added.)

A subsequently prepared bill analysis for the Assembly Judiciary Committee also indicates that the child's proposed placement is integral to the best-interest analysis:

> "Supporters of the bill . . . argue that it will provide greater stability for children awaiting adoption by preventing them from *being moved needlessly.* Moreover, the bill will ensure that children are not removed from prospective adoptive parents *unless the move* is truly in the child's best interest. Supporters argue that 'the determination concerning a child's *placement* in the best possible adoptive home may be the single most important determination made for and about the child. *That determination* should be made with adequate judicial oversight and *governed by the child's best interest*." (Assembly Com. on Judiciary, analysis of Sen. Bill No. 218 (2005–2006 Reg. Sess.) as amended June 2, 2005, p. 7, italics added.)[12]

---

[12] On our own motion, we took judicial notice of these bill analyses and provided the parties an opportunity to file supplemental briefs addressing their impact here.

Additionally, we note that "[w]hen a minor is in the custody of a person who is *not* the minor's parent or predependency probate guardian, the juvenile court may grant a section 388 petition to change a minor's placement based solely on the best interest of the minor, and need not find that the current placement is detrimental." (*A.H. v. Superior Court* (2013) 219 Cal.App.4th 1379, 1393.) In sharp contrast, if the agency recommends removing the child from the home of his or her parents or predependency petition guardian, the government must prove detrimental circumstances exist by clear and convincing evidence. (§ 361, subd. (c).)[13] Thus, where the Legislature intends certain classes of caregivers to retain placement absent a showing of grounds for removal alone, it knows how to do so. The absence of such language from section 366.26(n) further supports our conclusion that the juvenile court correctly considered L.M.'s proposed placement as part of its best interest analysis under section 366.26(n)(3).

---

[13]    Section 361, subdivision (c) provides in part: "A dependent child shall not be taken from the physical custody of his or her parents, guardian or guardians . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances listed in paragraphs (1) to (5), inclusive . . . . [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's, guardian's . . . physical custody. . . . [¶] (2) The parent, guardian . . . is unwilling to have physical custody of the minor . . . . [¶] (3) The minor is suffering severe emotional damage . . . and there are no reasonable means by which the minor's emotional health may be protected without removing the minor from the physical custody of his or her parent, guardian . . . . [¶] (4) The minor or a sibling of the minor has been sexually abused, or is deemed to be at substantial risk of being sexually abused, by a parent, guardian . . . and there are no reasonable means by which the minor can be protected from further sexual abuse or a substantial risk of sexual abuse without removing the minor from his or her parent, guardian . . . . [¶] (5) The minor has been left without any provision for his or her support . . . ."

21

B.      *The Best Interest Finding is Supported by Substantial Evidence*

Kate and Jaime contend the court abused its discretion in removing L.M. from their care because "expert testimony showed that [L.M.] would suffer detriment should her secure attachment with Kate and Jaime be severed."  They also assert it was "entirely uncertain" and speculative how L.M. "would fare in transitioning" to the E.'s home.

On appeal from an order of removal under section 366.26(n)(3), we determine whether the record contains substantial evidence to support the trial court's finding that removal was in the child's best interest.  (See *M.M.*, *supra*, 235 Cal.App.4th at p. 64.) Under the substantial evidence standard of review, an appellate court reviews the record in the light most favorable to the trial court's findings.  (See *In re George T.* (2004) 33 Cal.4th 620, 630-631.)  " ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' "  (*Id.* at p. 631.)  We may not reweigh or express an independent judgment on the evidence.  (*In re Laura F.* (1983) 33 Cal.3d 826, 833.)

Kate and Jaime's argument fails because it disregards Dr. Himelstein's testimony. She testified, "I do not believe it would be traumatizing" for L.M. to move to another loving home.  In response to the court's questioning, Dr. Himelstein reiterated that L.M. would not suffer any trauma by being removed from Kate and Jaime's care and placed with the E's:

> "THE COURT:  In your professional opinion, knowing what you
> know about this case and the persons involved in the case, including

22

[L.M.], do you have an opinion professionally whether or not you think she might have trauma by being moved to another home?

"[Dr. Himelstein]: To this home, to the [E.'s] home?

"THE COURT: Right.

"[Dr. Himelstein]: I do not think—I do not see that she would be traumatized by it."

To support their argument, Kate and Jaime cite Dr. Vaquero's testimony that a change in placement places the child at risk of a disruption in development. They also rely on O'Connor's testimony that in her opinion, L.M. would suffer trauma if removed from her healthy and secure attachment to Kate and Jaime. The juvenile court expressly stated, however, that "[a]s to the experts, and the trauma . . . I found that Dr. Hemmelstein [*sic*] was the most credible expert." As a reviewing court we can neither reweigh the evidence nor reject the juvenile court's credibility determinations. (*T.W.*, *supra*, 203 Cal.App.4th at p. 47 [appellate court must "defer to the juvenile court's findings of fact and assessment of the credibility of witnesses"].) Additionally, Dr. Himelstein testified that "absolutely" L.M. would benefit from growing up with a biological sibling in her home. She also explained that as L.M. "grows up, develops her core beliefs and identity," having a "warm biological sibling relationship in her home on a daily basis" would be a "powerful and positive" influence on her development, exceeding that which L.M. would enjoy from a warm relationship with a grandparent who sees her twice a month. Accordingly, the juvenile court's finding that L.M. will flourish with the E.'s is supported by substantial evidence and not unduly speculative.

23

Kate and Jaime also contend their case is "similar" to *M.M.*, *supra*, 235 Cal.App.4th 54, where the Court of Appeal vacated a placement order. We disagree because *M.M.* is materially distinguishable. There, the child (M.M.) was placed with a prospective adoptive parent prior to termination of her biological parents' parental rights. Shortly before the hearing to terminate those rights, the agency recommended that M.M. be placed with her aunt. Although the prospective adoptive parent was present at the hearing, she was only in the audience; she "was not asked to join the parties at the counsel table, or asked her position on the proposed change of placement." (*M.M.*, at p. 59.) The agency did not present any evidence in favor of changing M.M.'s placement, but the court nonetheless ordered her placed with the aunt—and effectively removed her from the prospective adoptive parent. (*Ibid.*) The prospective adoptive parent appealed, asserting she was deprived of the notice and hearing to which she was entitled under section 366.26(n). (*M.M.*, at pp. 59-60.) The appellate court agreed, stating that the prospective adoptive parent "had no notice, or even reason to suspect, that [the agency] intended to continue to pursue its request to remove the minor from her home." (*Id.* at p. 63.) The error was prejudicial because both the prospective adoptive parent and the aunt were suitable caregivers, and there was no evidence that removing the child was in her best interest. (See *id.* at p. 64.)

Unlike the situation in *M.M.*, *supra*, 235 Cal.App.4th 54, here Kate and Jaime fully participated in the hearing. In addition, there is ample substantial evidence, including expert testimony, that removing L.M. from Kate and Jaime's care and placing her with the E.'s is in L.M.'s best interest.

Kate and Jaime's reliance on *In re M.H.* (2018) 21 Cal.App.5th 1296 is also unavailing. There the court faced the similarly difficult task of deciding whether to remove a one-year old and place the child elsewhere (in that case, his maternal great-aunt's home). Both homes were potentially beneficial to the child. The de facto parents in that case had cared for the child since birth and he was thriving in their care. On the other hand, the maternal great aunt offered a biological connection and was willing and able to provide the child a loving home. (*Id.* at p. 1305.) The juvenile court concluded that continued placement with the de facto parents was in the child's best interest. (*Id*. at pp. 1305-1306.) In affirming the juvenile court's decision, the Court of Appeal recognized the deference it, as a reviewing court, owed the juvenile court in making a difficult placement decision. (*Ibid*.)

Here, although the juvenile court's decision was the opposite of that made in *In re M.H.*, *supra*, 21 Cal.App.5th 1296, the same standard of review compels affirmance. We understand, as did the Court of Appeal in *In re M.H.*, that the juvenile court was in the best position to make the difficult decision of which placement, between two excellent options, was in L.M.'s best interest. Substantial evidence supports the court's finding that removal here was in L.M.'s best interest, and in so ruling the court did not abuse its discretion.[14]

---

14     Because we affirm the juvenile court's ruling based on its finding that removing L.M. is in her best interests under a standard applicable as if Kate and Jaime were designated prospective adoptive parents, it is unnecessary to address the E.'s and V.E.'s contentions that the order may be affirmed on an alternative basis under section 388.

DISPOSITION

The juvenile court's orders entered December 28, 2018, including but not limited to its order authorizing the Agency to remove L.M. from Kate and Jaime's care, and determining that it is in L.M.'s best interest to be placed with the E.'s, are affirmed.

DATO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

GUERRERO, J.

Filed 9/12/19

**CERTIFIED FOR PUBLICATION**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re L.M., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>D.M.,<br><br>      Defendant and Appellant;<br><br>KATE K. et al.,<br><br>      Objectors and Appellants;<br><br>JOHN E. et al.,<br><br>      Respondents. | D075120<br><br>(Super. Ct. No. EJ3761B)<br><br><br><br><br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed August 20, 2019, was not certified for publication. It

appearing the opinion meets the standards for publication specified in California Rules of

Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is

GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

HUFFMAN, Acting P. J.

Copies to:  All parties