Filed 5/24/21

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re DANIEL F., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. DANIEL F. et al., Defendants and Appellants. | A160929 (Alameda County Super. Ct. No. JD-030689-01) |

Monica Z. (Mother), mother of minor Daniel F. (Daniel), and Daniel F. (Father), alleged father of Daniel, appeal after the juvenile court declared the child a dependent, terminated parental rights, and placed him for adoption.

In the unpublished portion of our opinion, we affirm the juvenile court's order denying Mother's oral request to continue the permanency planning hearing (Welf. & Inst. Code,[1] § 366.26), as Mother failed to demonstrate good cause for both the oral nature of the request and the requested continuance.

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part A of the Discussion.

[1] Unless otherwise noted, further section references are to the Welfare and Institutions Code.

1

In the published portion of our opinion, we reverse the juvenile court's order denying Father's petition under section 388 to vacate the disposition order. Father, who resides in Mexico, was never served with the dependency petition, or notice of the jurisdiction and disposition hearing, or the statutorily required form for asserting paternity (§ 316.2, subd. (b)). While the Alameda County Social Services Agency (Agency) maintains that Father's whereabouts were unknown until late in the proceedings, the Agency was in contact with Father's sister early on, and it was she who eventually put the Agency in contact with Father. Liberally construing Father's petition, we conclude Father was entitled to an evidentiary hearing as to whether the Agency ignored the most likely means of finding him and thereby denied him due process. (*In re D.R.* (2019) 39 Cal.App.5th 583, 591–592 (*D.R.*).) Accordingly, we reverse the order denying Father's section 388 petition and remand for an evidentiary hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Section 300 Petition and Detention

On January 29, 2019, the Agency filed a dependency petition alleging that Daniel, three and a half years old at the time, came within the juvenile court's dependency jurisdiction under section 300, subdivisions (b)(1) and (g). The petition alleged Mother had a history of untreated substance abuse that rendered her incapable of providing care, protection, and support for Daniel. It was further alleged that Mother's use of alcohol endangered Daniel's health and safety, as Mother, her boyfriend Carlos, and Daniel had been involved in an automobile accident during which Mother and Carlos were intoxicated, and Daniel was unrestrained in the car. The petition alleged that Father's whereabouts and ability and willingness to care for Daniel were unknown.

2

The Agency further reported that Mother and Daniel were transient and occasionally slept at the home of Mother's husband, I.Z. Monica M., Daniel's adult sibling, told the Agency that Mother did not have contact information for Father but believed he resided in Mexico. At the detention hearing, the juvenile court ordered Daniel detained and set the matter for a jurisdiction and disposition hearing.

## B. Jurisdiction and Disposition

In its jurisdiction and disposition report, the Agency recommended that Daniel be declared a dependent of the juvenile court and remain in out of home placement, with family reunification services provided to Mother. The Agency further recommended supervised visitation until Mother obtained substance abuse treatment and demonstrated the ability to live sober. Father was again listed as Daniel's alleged father with whereabouts unknown.

The Agency reported Mother's child welfare history, including referrals it began receiving in 2001 alleging general neglect of Daniel's siblings. At the time of the report, Mother had five other minor children who were not in her care. Mother admitted using marijuana and cocaine, and she indicated willingness to participate in alcohol testing and substance abuse treatment.

In an addendum report, the Agency reported that Daniel expressed anger towards his family and one of the foster parents when a visit with his sisters ended. The foster parents reported increasing tension between Daniel and their son.

The jurisdiction and disposition hearing was continued twice during February and March 2019 due to Mother's continued hospitalization after the car accident. In a further addendum report, the Agency again listed Father as Daniel's alleged father and stated that Father "has not established a legal

3

basis for services at this time." The Agency reported that visits between Mother and Daniel had been going well. Additionally, Daniel's relationship with his foster parents' son had improved, and the foster parents had been in communication with Mother.

At the March 20, 2019, contested jurisdiction and disposition hearing, the juvenile court declared Daniel a dependent and found that Mother had made no progress towards alleviating or mitigating the causes necessitating placement. The court ordered that reunification services be provided to Mother.

### C. Initial Contact with Ana N.

The Agency identified Father's sister, Ana N., as the only paternal relative among potential relative caretakers. It appears from the record that the Agency first began trying to contact her in April 2019. A social worker called and left messages for Ana N. on April 3, 26, and May 7, 2019. The social worker finally spoke with Ana N. on May 9, 2019. According to the Agency, when Ana N. was asked about possible placement of Daniel, she stated "she didn't think that her family would be able to have placement but she would follow up with her husband and get back to the undersigned. [Ana N.] shared that she had only met Daniel once when he was born." The social worker followed up with Ana N. on May 16, 2019, "and left a voicemail message requesting a call back to discuss her decision regarding placement."

### D. Absent Parent Search Request

The Agency reported that on February 6, 2019, a child welfare worker had submitted an "Absent Parent search request" for Father. However, when the Agency conducted a follow up inquiry on August 28, 2019, it was informed that the initial request "wasn't received or processed." The Agency resubmitted the search request that same day.

4

**E. Agency's Section 388 Petition**

On September 3, 2019, the Agency filed a section 388 petition seeking termination of reunification services to Mother and the scheduling of a section 366.26 permanency planning hearing. The Agency reported that Mother had not participated regularly in services and failed to maintain consistent communication with the Agency. She did not make substantive progress towards completion of her case plan and failed to participate consistently in visitation with Daniel. Father was not identified in the Agency's petition as a parent, nor was he listed among the persons legally entitled to notice.

**F. Six-Month Status Review**

In its six-month status review report, the Agency reported that Mother had not cooperated with her case plan, which included drug testing and participation in family therapy and substance abuse services; nor had she enrolled or participated in a substance abuse treatment program. Mother did not maintain consistent contact with Agency staff, did not regularly attend scheduled meetings, and missed visits with Daniel. Daniel was doing well in his foster placement, where he had been since January 2019. Mother's inconsistent visitation had been harmful to Daniel, as he was distressed and felt sad and conflicted about his relationship with his biological and foster families.

At the six-month review hearing in September 2019, Father was designated "not present," and Mother appeared through counsel. A contested hearing and a hearing on the Agency's section 388 petition were scheduled for October 2019, and Mother was ordered to return and be present.

In an addendum report, the Agency reported that Father's whereabouts remained unknown, despite reasonable efforts to locate him. The Agency

5

attached a "Declaration of Search Efforts," executed in September 2019, stating that Father's last known address was in Mexico, that his precise whereabouts were unknown, and that the Agency had searched various government and other databases of records for California and Alameda County, none of which provided sufficient information to locate Father.[2]

At an October 2019 hearing, the juvenile court found that the allegations of the Agency's section 388 petition were true, and that Mother had made minimal progress towards alleviating the causes necessitating Daniel's out of home placement. The court further found that returning Daniel to Mother's home would create a substantial risk of detriment to his safety, protection, or physical and emotional wellbeing. The court terminated reunification services to Mother and set the matter for a permanency planning hearing in February 2020.

### G. Due Diligence Efforts and Hearing

In describing its efforts to locate Father, the Agency first noted that there was no father named on Daniel's birth certificate, and that Mother had informed several child welfare workers that Father was Daniel's biological father. Mother believed Father was in Mexico but had no contact information for him.

Mother further stated that she married I.Z. in 2000, "but that they are separated, and [I.Z.] is not the minor's biological father." I.Z. likewise told a child welfare worker in January 2019 that he was not Daniel's father.

---

[2]     The identified databases were as follows: CORPUS/CRIMS records of Alameda County; Department of Motor Vehicle records; CalWIN website; Probation Index of Alameda County; Department of Child Support Services; Registrar of Voters of Alameda County; <http://www.truepeoplesearch.com> and <http://www.zabasearch.com>; Accurint; Child Welfare Services Case Management System; and California Department of Corrections – ID Warrant Unit.

6

Believing I.Z. might legally be the presumed father of Daniel, the Agency left a message with I.Z.'s adult daughter and sent I.Z. a "JV-505 (Declaration of Paternity) form and letter," but he did not respond.

In November 2019, an Agency worker spoke with Father's sister, Ana N., who provided a telephone number and date of birth for Father and said he was living in Mexico City "with no stable address." The Agency worker "left telephone messages for [Father] on 11/15/2019 and 11/18/2019" but received no response.

In December 2019, the Agency filed a second declaration of search efforts for Father, stating that his whereabouts remained unknown, and that the same databases as before were searched. An Oakland address was obtained for a person matching Father's name and date of birth, and the Agency sent a letter to that address in November 2019, but there was no response.

A due diligence hearing was held in early January 2020. The juvenile court found that the Agency had exercised due diligence in searching for Father. The court stated that Father may be served by publication notice in the California Bay Area and in Mexico City.

**H. Section 366.26 Reports and Further Due Diligence**

In its first of several section 366.26 reports, the Agency reported that Mother had several visits with Daniel from April to July 2019, but she did not respond to attempts to contact her in July and August 2019 and did not appear for a visit in August 2019. The Agency maintained that Mother's inconsistent attendance and participation in visits were disruptive to Daniel. The Agency argued that Daniel was adoptable and recommended adoption as his permanent plan, with Daniel's foster parents as prospective adoptive parents.

7

The juvenile court held a section 366.26 hearing in early February 2020. Mother did not appear, and her counsel informed the court that she was not in contact with Mother. The Agency reported that Father had been given notice by publication in Mexico City and the California Bay Area on February 6, 2020. The court found that notice had been given as required by law, and that service for future dates by regular first-class mail to Mother would be sufficient.

In its March 2020 memorandum report, the Agency continued to recommend that parental rights be terminated and that Daniel be placed for adoption. Mother was late for supervised visits in February 2020 and did not attend Child and Family Team meetings in February and May 2020 during which post-adoption visitation was discussed.

In May 2020, the Agency filed a due diligence memorandum asking that the matter be continued for 45 days in order to complete a search for Mother. The Agency reported that Mother failed to appear for a scheduled visit and had not kept in contact since mid-March 2020.

The Agency also reported that on May 12, 2020, a social worker spoke with Father's sister, Ana N., who "had the father called the undersigned." At last, the Agency made telephone contact with Father, who provided the Agency with an address in Mexico and a telephone number where he could be reached. Father was "opposed to adoption, and wants to obtain custody of his son. He requested an attorney."

A hearing was held in May 2020, during which the Agency asked the juvenile court to schedule the matter for a permanency planning hearing. Father's appointed counsel appeared and requested time to discuss the matter with his client. The court continued the matter and advised Father to

file a request to change court order on Judicial Council form JV-180[3] if he wished to be heard before the section 366.26 hearing.

The Agency filed another section 366.26 report indicating that Father was given notice of the section 366.26 hearing by certified mail. According to the Agency, Father "acknowledged that he had not had contact with Daniel in over a year, but stated that it was because the mother had not provided him with any information about Daniel's whereabouts and what was happening with him."

A section 366.26 hearing scheduled for July 2020 was continued to September 1, 2020, due to Mother's incarceration.

## I. Father's Section 388 Petition

Father's counsel filed a section 388 petition requesting reversal of the disposition order entered on March 20, 2019, and the orders setting the section 366.26 hearing. Father alleged he "was never given proper notice of the intial [sic] dependency petition nor of the JV180 petition filed by the county requesting the setting of a 366.26 hearing. Father was recently notified of the dependency action and wants to have his son placed in his care." He further alleged his requested modification "would allow for the opportunity for the child to be placed with, and raised by, his father instead of continuing to be in foster care. [T]his will be in the child's best interests because he will be placed with family."

## J. Hearings on Section 366.26 and Father's Section 388 Petition

On September 1, 2020, both Mother and Father finally appeared before the juvenile court. Mother's new counsel, Kelly Pretzer, orally requested that the matter be continued on the ground there was outstanding discovery for

---

[3]     Judicial Council form JV-180 is the required form for petitions under section 388. (Cal. Rules of Court, rule 5.570(b).)

9

"visitation logs, interactions between Daniel and the family." Pretzer explained that on the night before the hearing, she sent a copy of the continuance request to the juvenile court's email address, but the document was rejected because the bottom portion of the file was cut off. According to Pretzer, the discovery request was made by Mother's former counsel in mid-August 2020, and the Agency had been unable to respond in time. Pretzer claimed she could not put together a defense until reviewing the discovery. Daniel's counsel expressed concern that the section 366.26 hearing had already been continued multiple times, that the discovery in question had not been requested until August 2020, and that a further continuance would negatively impact Daniel. The court found that Mother's continuance request "had not been brought in a procedurally correct manner" and denied it.

As to Father's section 388 petition, the juvenile court found that Father had "failed to state prima facie evidence that we should hold an evidentiary hearing or that there's a change of circumstances, new evidence, or that the best interest of the child would be met by holding an evidentiary hearing or even possibly changing the present orders and setting aside the disposition orders." According to the court, "the Agency cannot be faulted or flawed for not finding sir [sic] at such time, and he's had such minimal contact with the Agency." The court further noted that Father "heretofore, has had practically no relationship at all, from the Court's understanding, with the child. And there is not sufficient evidence that the best interest of the child would be further[] met or even possibly attained by holding an evidentiary hearing or considering and granting the request that [Father] seeks the Court to do."

The juvenile court then found by clear and convincing evidence that Daniel was adoptable and made adoption his permanent plan. The court further found that biological paternity had not been established and that I.Z.

10

"is not the father of [Daniel] and is not a party to this case." The court terminated the parental rights of Mother, Father, and "any unknown father."

Mother and Father each appealed.

DISCUSSION

## A. Mother's Appeal

Mother contends the juvenile court abused its discretion in denying her oral motion to continue the section 366.26 hearing. We disagree.

A continuance of any dependency hearing "shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance." (§ 352, subd. (a)(2); Cal. Rules of Court, rule 5.550(a)(2).) A continuance must not be contrary to the interests of the minor. (§ 352, subd. (a)(1); Cal. Rules of Court, rule 5.550(a)(1).) Written notice of a motion for continuance "shall be filed at least two court days prior to the date set for hearing, together with affidavits or declarations detailing specific facts showing that a continuance is necessary, unless the court for good cause entertains an oral motion for continuance." (§ 352, subd. (a)(3).)

We review the juvenile court's denial of a continuance motion for abuse of discretion and find none here. (*In re F.A.* (2015) 241 Cal.App.4th 107, 117.) Mother's counsel made no showing of good cause for the oral nature of her continuance request, and her attempted filing of a written motion the night before the hearing, even if not rejected for technical reasons, would have been untimely. (§ 352, subd. (a)(3).) Counsel offered no explanation as to why a timely written motion could not have been made earlier.

Furthermore, even if we assumed there was good cause for an oral motion, the juvenile court did not abuse its discretion in finding an absence of good cause for the continuance itself. In considering the child's interests,

11

substantial weight must be given to a child's needs for stability and prompt resolution of custody status. (§ 352, subd. (a)(1); Cal. Rules of Court, rule 5.550(a)(1).) Here, it did not exceed the bounds of reason for the juvenile court to conclude that Mother's 11th hour request was contrary to Daniel's need for prompt resolution of his custody status. The section 366.26 hearing had already been set and continued multiple times, including delays occasioned by Mother's unexplained lack of communication with the Agency. Mother was, at all times, represented by counsel who could have made a timely request for additional discovery. Other than asserting a vague need to review the outstanding discovery, Mother's counsel did not explain how the requested continuance would be in Daniel's interests. On this record, the juvenile court did not abuse its discretion in denying Mother's request.

### B. Father's Appeal

As a threshold matter, we reject the Agency's contention that Father forfeited his claim of notice error by not objecting at hearings held in May and July 2020. Besides the fact that these were abbreviated proceedings in which the matters discussed were scheduling and a further continuance, the Agency relies solely on the general rule that a party is precluded from urging for the "first time on appeal" a point "not raised in the trial court." Here, Father clearly raised his claim of notice error in his section 388 petition with the juvenile court and therefore preserved it for appeal. (*In re R.A.* (2021) 61 Cal.App.5th 826, 837 (*R.A.*).)

Section 388 allows a parent or other person having an interest in a dependent child to petition the juvenile court to change, modify, or set aside any prior order because of changed circumstance or new evidence. (§ 388, subd. (a).) "A juvenile court may summarily deny a section 388 petition without an evidentiary hearing, but 'a petition must be liberally construed in

12

favor of its sufficiency [citation] and a hearing may be denied only if the application fails to reveal any change of circumstance or new evidence which might require a change of order.' " (*R.A.*, *supra*, 61 Cal.App.5th at p. 836.) In determining whether a parent has made a prima facie showing under section 388, we may consider the entire factual and procedural history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189 (*Justice P.*).) We review the juvenile court's summary denial of a section 388 petition for abuse of discretion. (*R.A.*, at p. 837.)

Liberally construed, Father's allegation that he was not given "proper" notice of the proceedings challenges the Agency's diligence in attempting to locate and serve him. A section 388 petition is the appropriate method for raising a due process challenge based on lack of notice. (*Justice P.*, *supra*, 123 Cal.App.4th at p. 189.) "Social services agencies, invested with a public trust and acting as temporary custodians of dependent minors, are bound by law to make every reasonable effort in attempting to inform parents of all hearings. They must leave no stone unturned." (*In re DeJohn B.* (2000) 84 Cal.App.4th 100 102 (*DeJohn B.*).) "A parent's fundamental right to adequate notice and the opportunity to be heard in dependency matters involving potential deprivation of the parental interest (*In re B.G.* (1974) 11 Cal.3d 679, 689) has little if any, value unless that parent is advised of the *nature* of the hearing giving rise to that opportunity, including what will be decided therein. Only with adequate notice can one choose to appear or not, to prepare or not, and to defend, or not." (*In re Stacy T.* (1997) 52 Cal.App.4th 1415, 1424.)

Although alleged fathers, as distinguished from presumed fathers, have fewer rights in dependency proceedings and are not entitled to custody, reunification services, or visitation (*In re J.W.-P.* (2020) 54 Cal.App.5th 298,

13

301 (*J.W.-P.*)), they nonetheless possess due process rights to be given notice and an opportunity to appear, to assert a position, and to attempt to change their paternity status (*In re Paul H.* (2003) 111 Cal.App.4th 753, 760 (*Paul H.*)). When an alleged father claims that a lack of notice of the proceedings caused him to fail to achieve presumed father status prior to expiration of the reunification period, his remedy is to file a section 388 petition. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 453.)

There is no due process violation where a child welfare services agency has exercised reasonable diligence to provide notice to a parent whose whereabouts are unknown. (*Justice P., supra,* 123 Cal.App.4th at p. 188.) On this score, reasonable diligence "denotes a thorough, systematic investigation and an inquiry conducted in good faith." (*Ibid.*) It includes searching not only "standard avenues available to help locate a missing parent," but " 'specific ones most likely, under the unique facts known to the [Agency], to yield [a parent's] address.' " (*D.R., supra,* 39 Cal.App.5th at p. 591, citing *In re Arlyne A.* (2000) 85 Cal.App.4th 591, 599 [agency failed to search "most likely" avenues, e.g., calling directory assistance of city where parents reportedly lived and obtaining police report that showed where father worked]; see also *Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 481 (*Ansley*) [no evidence in record that agency attempted to serve father with notice of proceedings].) Thus, in *D.R.,* the court found a violation of due process where the child welfare services agency "searched almost two dozen United States government databases, well aware Father had been deported to Mexico," but ignored the "most likely means of being able to actually identify Father and gain his contact information to notify him," such as asking for help from his children who were in contact with him through social media. (*D.R., supra,* 39 Cal.App.5th at pp. 591–592.)

14

Here, the petition and history of the case raise similar questions about the Agency's efforts, particularly in light of its early contact with Father's sister, Ana N. The first documented conversation between the Agency and Ana N. occurred in early May 2019, just a few weeks after the jurisdiction and disposition hearing. Based on the social worker's account, this conversation pertained only to possible placement for Daniel, with no indication that Ana N. was asked about Father's whereabouts or contact information. It was not until November 2019 that the Agency reported having conversations with Ana N. about contacting Father, but this was already after Mother's reunification services had been terminated and the matter set for permanent placement. Ana N. provided the Agency with Father's telephone number, and the Agency left him two messages, but the record does not indicate that the Agency followed up on these calls. Contact was established only when Ana N., in May 2020, "had" Father call the Agency.

Several questions emerge from this record of events. When did Ana N.'s identity become known to the Agency? Could it have contacted her prior to April 2019, or better yet, prior to the jurisdiction and disposition hearing? During their initial conversations in May 2019, was Ana N. asked about Father's location and contact information, or was this only raised in November 2019, after the case had already proceeded to the permanency planning stage?[4] Without further clarification, it appears, as in *D.R.*, that this is "a case where there were leads from [a] cooperative family member," but the Agency searched only standard avenues without taking advantage of

_____

[4]    Ana N. reportedly told the Agency in November 2019 that Father had no "stable" address in Mexico City, which could imply that he was unhoused. But this does not suggest Father could not be contacted by phone or other means.

15

the " 'specific ones most likely, under the unique facts known to the [Agency],' " to yield Father's contact information. (*D.R.*, *supra*, 39 Cal.App.5th at p. 591.)

The Agency points out it began a formal investigation of Father in early February 2019 when it submitted an absent parent search request. However, for reasons unexplained, this request "wasn't received or processed," and the Agency does not elaborate on the circumstances of this lapse. Nor does the Agency explain why it failed to follow up on this request for more than six months.

Meanwhile, the Agency's due diligence efforts were limited to databases of records for California and Alameda County, even though the Agency was told by Mother, Monica M., and Ana N. that Father resided in Mexico. The Agency could have contacted the Mexican consulate or the Mexican social services agency Desarrollo Integral para la Familia (DIF) for assistance to locate or serve Father, especially after the Agency obtained his date of birth and telephone number from Ana N. in November 2019. (See, e.g., *In re A.G.* (2017) 12 Cal.App.5th 994, 998 [agency requested DIF evaluate father's home in Mexico and provide classes]; *In re R.L.* (2016) 4 Cal.App.5th 125, 133, 147–148 [agency requested DIF assistance through international liaison]; *In re Rosalinda C.* (1993) 16 Cal.App.4th 273, 276 [agency requested Mexican consulate and DIF to make home visit in Mexico].)

In summarily denying Father's petition, the juvenile court observed that Father "has had practically no relationship at all, from the Court's understanding, with the child." But the mere fact that Father was in Mexico throughout the proceedings does not indicate he and Daniel had no relationship. Father told the Agency in or around May or July 2020 that he had not had contact with Daniel in "over a year." By implication, Father may

16

have been in contact with Daniel during these very proceedings. More importantly, Father said the reason he was not in contact with Daniel for so long was because Mother "had not provided him any information about Daniel's whereabouts and what was happening with him." We see no indication in the record as to whether the Agency determined if Mother was preventing Father from having contact with Daniel.

The Agency contends that Father's petition was properly denied because he never elevated his status to that of presumed father, and thus, he had no right to seek services or custody. We cannot agree.

It is undisputed that the Agency never provided Father with Judicial Council form JV-505 (form JV-505), which allows an alleged father to indicate his position with regard to paternity, including by requesting that the juvenile court enter a judgment of paternity. (*Paul H.*, *supra*, 111 Cal.App.4th at p. 761.) Where one or more men are identified as an alleged father, "each alleged father shall be provided notice" of the dependency proceedings and the potential for termination of parental rights, and JV-505 "shall be included with the notice." (§ 316.2, subd. (b).)

Of significance here, the inquiry into alleged fathers must occur "[a]t the detention hearing, or as soon thereafter as practicable." (§ 316.2, subd. (a).) It follows that diligent efforts to locate and serve notice and form JV-505 on alleged fathers must likewise occur from the earliest stages of the proceedings. Here, the Agency appears to have reserved its more serious efforts to locate Father for the permanency planning stage. Consequently, the Agency's failure to provide Father with the statutorily required materials denied him adequate notice of his rights and the ability to access procedures for establishing paternity and obtaining reunification services. (*J.W.-P.*, *supra*, 54 Cal.App.5th at pp. 306–307; *Paul H.*, at p. 761.)

17

The Agency argues, and the juvenile court found, that Father's requested modification of the disposition order was not in the minor's best interests. Generally, a parent seeking modification under section 388 must make a prima facie showing of a genuine change of circumstances or new evidence, and that revoking the previous order would be in the best interests of the children. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.) "The analysis, however, is somewhat different when a parent shows he did not receive notice of the dependency petition in violation of due process. In *Ansley*, the court held that when a section 388 petition is based on lack of notice, a separate showing of best interest is not required because 'a judgment that is proven void due to lack of due process notice suffers from a fatal jurisdictional defect. It may not be perpetuated on the rationale that setting it aside would not, in the [juvenile] court's view, be in the best interests of the child.' " (*R.A.*, *supra*, 61 Cal.App.5th at pp. 836–837; see *Ansley*, *supra*, 185 Cal.App.3d at pp. 490–491 [always in minor's best interests to have dependency adjudication based on participation of all interested parties entitled to notice].)

The court in *Justice P.* reached a different conclusion, distinguishing *Ansley* as involving "no efforts" by the child welfare services agency to give notice, while in the case before it, the "Agency initially made reasonable search efforts, but later did not follow through." (*Justice P.*, *supra*, 123 Cal.App.4th at p. 190.) Rejecting the argument that any section 388 petition alleging a prima facie notice violation necessarily meets the "best interests" showing, *Justice P.* reasoned that where reasonable efforts have been made, but a missing parent later surfaces, "it does not automatically follow that the best interests of the child will be promoted by going back to square one and relitigating the case." (*Id.* at p. 191.)

18

We believe this case is more akin to *Ansley* and *R.A.* because, at least on the face of the petition and the current record, Father made a prima facie showing that the Agency made little to no effort to give him notice until it was poised to terminate parental rights. As we have recounted, the Agency's February 2019 absent parent search request was a nullity that went undiscovered for more than six months. Despite being in contact with Father's sister since May 2019, the Agency did not appear to ask Ana N. for Father's contact information until November 2019, whereupon she provided it and the Agency left two messages for him.[5] The Agency's due diligence declarations, executed in September and December 2019, showed that searches were never conducted beyond records for California and Alameda County, even though Father was believed to be in Mexico. Meanwhile, Father was deprived of notice of critical proceedings during which he could have established paternity and asserted parental rights. Though we are keenly mindful of Daniel's interests in having a stable placement as soon as possible, a " 'best interests' " showing was not required under the circumstances. (*R.A.*, *supra*, 61 Cal.App.5th at pp. 836–838; *Ansley*, *supra*, 185 Cal.App.3d at pp. 490–491.)

The Agency contends any error was harmless. Applying the reasonable probability of prejudice standard (*In re Celine R.* (2003) 31 Cal.4th 45, 59–60), we conclude otherwise. Notice of a relatively inconsequential hearing was not at issue here. Rather, Father was deprived critical notice of the

---

[5]   Although it is unclear why Father did not return the November 2019 messages, the record does not disclose the content of those messages or whether they were received. Furthermore, it appears questionable whether these two messages demonstrate that the Agency "le[ft] no stone unturned" (*DeJohn B.*, *supra*, 84 Cal.App.4th at p. 102), as the Agency made comparatively more attempts to establish contact with Ana N. in April and May 2019 than it did with Father in November 2019.

19

dependency proceedings and his rights as an alleged parent until just before the hearing in which parental rights were subject to termination. Meanwhile, there was minimal information in the record regarding Father's circumstances and background, including why he was in Mexico, whether he is capable of returning to the United States, and the nature of his and his relatives' relationships with Daniel. "We cannot assume, based on this dearth of information, that had [Father] established his paternity and been appointed counsel, he would not have received reunification services" or otherwise been able to assert and protect his parental rights. (*Paul H.*, *supra*, 111 Cal.App.4th at pp. 761–762; see *J.W.-P.*, *supra*, 54 Cal.App.5th at p. 307.)

The Agency nevertheless maintains any error was harmless because it is unlikely that Father can establish paternity. We disagree. That there was no named father on Daniel's birth certificate simply demonstrates an uncertainty, but there appears nothing improbable about Father's potential to establish paternity. Mother consistently told child welfare workers that Father, not I.Z., was the biological father of her son (who notably bears the same name as Father). There is no indication that Ana N. ever disputed being the child's aunt, and she claimed to have met Daniel when he was born. When Father was finally contacted in May 2020, he did not deny parentage, but immediately expressed his opposition to adoption and sought appointment of counsel to advocate for him.

The Agency contends that I.Z. is the presumed father of Daniel pursuant to Family Code section 7611. (Fam. Code, § 7611, subd. (a) [presumption of parentage where child was born during marriage between presumed parent and natural mother].) However, I.Z. expressly denied paternity. And although I.Z. and Mother were married since 2000, she

20

reported that they were separated at an unspecified time. It remains unclear if Mother and I.Z. were separated for an appreciable time before Daniel was born.[6] Furthermore, the juvenile court expressly found that I.Z. was not the biological father of Daniel. Any arguments about I.Z.'s presumed paternity do not persuade us of the unlikelihood that Father could have established paternity had he been given adequate notice and opportunity to do so.

For the foregoing reasons, we conclude Father was entitled to an evidentiary hearing on his section 388 petition.[7] On remand, the juvenile court is directed to hold an evidentiary hearing, during which Father and the Agency may present evidence and argument on whether the Agency exercised due diligence in attempting to locate and provide notice to Father.

## DISPOSITION

The order of the juvenile court issued on September 1, 2020, is affirmed in part and reversed in part. We affirm the denial of Mother's request for a

---

[6] If Daniel was born more than 300 days after a judgment of separation by a court, then there would be no presumption of I.Z.'s paternity. (See Fam. Code, § 7611, subd. (a).)

[7] Father also challenges the juvenile court's jurisdiction on the ground that the Agency failed to serve him with notice in compliance with the Hague Service Convention (Convention on the Service Broad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638 (Hague Service Convention). When the Hague Service Convention applies, the failure to properly serve a party who resides outside the country "renders all subsequent proceedings void as to that person." (*In re Alyssa F.* (2003) 112 Cal.App.4th 846, 852; see *D.R.*, *supra*, 39 Cal.App.5th at p. 592.) We do not reach this matter, however, as the Hague Service Convention does not apply when the whereabouts of the person in question are unknown, despite a reasonable due diligence search (*D.R.*, at p. 593), and the determination of reasonable diligence here is to be made after an evidentiary hearing. We also express no opinion on whether the juvenile court acquired jurisdiction over Father through his appearance. (See *D.R.*, at pp. 593–594.)

21

continuance of the section 366.26 hearing, but we reverse the denial of Father's section 388 petition and remand for an evidentiary hearing.

_____
Fujisaki, Acting P.J.

WE CONCUR:


_____
Jackson, J.


_____
Wiseman, J.*




A160929



_____
*      Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

23

In re DANIEL F., a Person Coming Under the Juvenile Court Law
(A160929)

Trial Court: Alameda County

Trial Judge: Honorable Tara Flanagan

Attorneys:

First District Appellate Project, Jacob I. Olson; for Plaintiff and Appellant
(Mother) Appellate Defender's Inc. Pamela Rae Tripp for Plaintiff and
Appellant (Father).

Office of County Counsel, Alameda County; Donna R. Ziegler, County
Counsel, Samantha Stonework-Hand, Senior Deputy County Counsel,
Hannah L. Reed, Associate County Counsel.